## MISSISSIPPI RIVER LOGGING CO. v. ROBSON.

(Circuit Court of Appeals, Eighth Circuit. August 5, 1895.)

### No. 540.

1. CONTRACTS—DISCHARGE—ACT OF GOD.

One R. owned and operated a sawmill on the Mississippi river, and also owned a tract of timber land near the headwaters of the F. and C. rivers, from which he was drawing and expected to draw for some years his supply of logs. The M. Co. was engaged in the business of driving logs on the F. and C. rivers, and preparing the same for transportation on the Mississippi, and had done this work for R. Differences having arisen between them, a contract was made, in August, 1882, between R. and the M. Co., which provided that, "for the purpose of settling all differences and providing for the future," the M. Co. agreed to take control of all logs delivered to it by R. on the F. and C. rivers, drive them to a certain boom, and prepare them for transportation on the Mississippi, for which R. agreed to pay, "annually, at the close of each season's business," certain agreed sums. No period was expressly fixed for the duration of the contract. A flood afterwards caused a change in the river banks, making it necessary to abandon the boom named in the contract and construct another. Subsequently the M. Co. notified R. that it elected to terminate the contract. R. sued to recover additional sums which he had been obliged to pay for the work agreed to be done by the R. Co. *Held*, that the change in the river banks was not such an act of God as to discharge the contract, since the possibility thereof should have been foreseen and provided against in the contract, and since its occurrence did not render the performance of the contract impossible.

**2. SAME—MUTUALITY.**

*Held*, further, that the contract did not lack mutuality because of the absence of any agreement by R. to furnish logs, since, by virtue of its expressed purpose of settling differences, it operated as a release of existing claims, which would constitute a sufficient consideration for the M. Co.'s agreement, and made the contract in part an executed one.

**3. SAME—DURATION.**

*Held*, further, that the contract, in view of its purpose to provide for the future and its other terms, could not be held to be terminable at the will of either party, but that, by a fair interpretation of its terms, it was to continue as long as R. was actively engaged in removing timber from the lands on the F. and C. rivers owned by him at the date of the contract.

**4. EVIDENCE—BOOKS OF ACCOUNT.**

For the purpose of showing the quantity of logs cut, R. offered certain books, kept in his business. It appeared that the logs, as cut, were measured by the camp scalers, and the measurements entered in these books; that from time to time inspectors visited the camps, and verified these books by remeasuring a portion of the logs; and that, upon the books so verified, payments were made by R. to the log cutters. The inspectors who revised the books identified them, and testified to their correctness. *Held*, that the books were admissible without producing the camp scalers who originally measured the logs.

In Error to the Circuit Court of the United States for the Northern District of Iowa.

This was a suit by John Robson, the defendant in error, against the Mississippi River Logging Company, the plaintiff in error, to recover damages for a breach of a written contract between said parties, that was entered into on August 23, 1882. A jury having been waived, the case comes before this court for review on a special finding of facts made by the Honorable O. P. Shiras, before whom the case was tried. The several special findings that are most material to the discussion of the several errors that have been assigned are as follows:

"(2) I find that, for a number of years prior to 1882, the defendant company was engaged in the business of running and driving logs and timber down the Flambeau and Chippewa rivers, in the state of Wisconsin, to the Mississippi river, including in such business logs and timber owned by the defendant and logs and timber owned by third parties.

"(3) I find that, prior to 1882, the general mode in which the said business was carried on was as follows: The logs and timber were placed by the owners thereof on the banks or in the water of the said Flambeau and Chippewa rivers and the tributaries thereof. The driving of the logs down the rivers was performed by the defendant corporation or by the Chippewa Lumber & Boom Company, which latter company was under the control and management of the defendant. When the logs reached Beef Slough boom, which was situated on the lower part of the Chippewa river, they were taken possession of by the Beef Slough Boom Company, and were run into the boom managed by said company, and the logs belonging to the different owners were separated from the common mass, and run into pockets. Having been thus assorted, they were then brailed and formed into rafts in proper condition to be taken in tow by the raft boats, which conveyed them to their several points of destination upon the Mississippi river.

"(4) I find that for a number of years prior to the year 1882 the plaintiff, John Robson, had been engaged in the lumber business upon the Mississippi river; that he had a sawmill at Lansing, upon that river, and that he brought the logs sawed at the mill from the lands tributary to the Flambeau and Chippewa rivers in Wisconsin; that he owned a quantity of timber lands tributary to these streams, from which he annually cut a number of logs, and that he also bought logs from other persons, or bought the right to cut logs from lands owned by other persons and tributary to the streams above named; that, for a number of years prior to 1882, all the logs cut or bought by the plaintiff in the regions tributary to the Flambeau and Chippewa rivers were

driven for him by the defendant company or by the Chippewa Lumber & Boom Company.

"(5) I find that certain differences and disputes in regard to the handling of said logs, and the prices to be paid therefor by plaintiff, having arisen thereupon on the 23d day of August, 1882, the plaintiff and defendant entered into a contract in writing, of the following tenor and effect.

" 'Articles of agreement made and entered into this 23d day of August, 1882, by and between the Mississippi River Logging Company, a corporation organized under the laws of Iowa, party of the first part, and John Robson, party of the second part, witnesseth: Whereas, the party of the second part owns a large quantity of pine lands tributary to the Chippewa and Flambeau rivers and their branches in Wisconsin, and now has a large quantity of saw logs and timber in said streams, and expects to cut annually hereafter, and deliver in said streams, a large quantity of saw logs and timber to be driven to market down said stream, to the Mississippi river; and whereas, the said party of the first part is engaged in the business of driving logs down said streams to Beef Slough, for other parties; and whereas, differences having arisen between the party of the second part and the Chippewa Lumber & Boom Company (which is controlled by the party of the first part) in respect to the running and driving of logs: Now, therefore, for the purpose of settling all said differences and providing for the future, it is mutually agreed as follows: First. Said party of the first part, in consideration of the premises and of the promises of the said party of the second part, hereinafter mentioned, agrees to take possession and control of all logs and timber which the party of the second part shall deliver in said Chippewa river at or below the east and west forks thereof, and all that shall be delivered in said Flambeau river at or below the north and south forks of said stream, and to drive the same, at its own cost, charges, and expense, down said streams to and into Beef Slough boom, not exceeding an average of twenty-five millions of feet annually; said logs to be driven each season with all reasonable dispatch, and with as much care and facility as it shall drive its own logs. The logs of the party of the second part now in said streams are to be driven by said first party under this agreement. Any charges to be paid the Chippewa Lumber and Boom Company, or any other company, person, or persons, on account of said logs or any of the same, between the aforesaid forks of said streams and said Beef Slough boom, are to be paid by the said party of the first part. Second. And the said party of the first part, in consideration of the premises, further undertakes and agrees that the charges of the said Beef Slough Boom Company shall not exceed sixty cents per thousand feet for booming, assorting, and delivering in pockets and watching the said logs of the said party of the second part at all the mills on the Chippewa river. Third. And the party of the first part, in consideration of the premises, further undertakes and agrees to brail and deliver to the said second party, in a proper and usual manner, his said logs ready to be taken in tow by boat after the same are turned out into pockets by said Beef Slough Boom Company, and to do the same with all reasonable dispatch. Fourth. And the said party of the second part, in consideration of the premises, promises and agrees to pay to the said party, annually, at the close of each season's business, for taking the care, control, and delivering said logs into Beef Slough boom, as agreed as aforesaid, the sum of two hundred and fifty dollars; and, for brailing and delivering said logs ready for the towboat, twenty-five cents per thousand feet. And said party of the second part also further agrees to return to the said party of the first part the brailing lines used in brailing said logs, unless the same shall have been three times so used. Fifth. In case the said party of the second part associates any person or persons with him as partner or partners in such lumbering business, this agreement is to stand, apply, and operate in respect to such partnership. But no logs are to be handled by said party of the first part under this agreement except such as shall be owned by said party of the second part, or by him and others as partners. The cost of scaling the said logs as the same are turned into said Beef Slough boom is to be paid equally by the parties hereto.

" 'Witness our hands and seals, this 23d day of August, 1882.

" 'Mississippi River Logging Co.
" 'F. Weyerhauser, Pt.
" 'John Robson.'

"(6) I find that after the date of this contract, and up to April 4, 1889, both parties recognized their contract to be in full force, and the defendant company took charge of and handled all logs delivered to it by plaintiff in accordance with its provisions.

"(7) I find that on April 4, 1889, the defendant company notified the plaintiff, by a letter addressed to him, and received in due course of mail, that it would no longer be bound by said contract, the said letter reading as follows:

" 'Chippewa Falls, Wis., April 4th, 1889.

" 'Mr. John Robson, Winona, Minn.—Dear Sir: You will please to take notice that the Mississippi River Logging Company elects to, and does hereby, terminate the contract made with you for driving your logs on the Chippewa and Flambeau rivers in the state of Wisconsin, and for fitting said logs at Beef Slough for transportation down the Mississippi, being the contract bearing date August 23d, 1882, all the provisions of which are hereby terminated, and will not be hereafter considered binding between the parties. If you do not receive your logs at Beef Slough when delivered in the pockets, and fit them for transportation, it will be taken for granted that you elect to have this company act for you in that regard, charging therefor same as for like services done for others.

" 'Yours respectfully,                Mississippi River Logging Co.
" 'By F. Weyerhauser, Prest.'

"(8) I find that since said 4th day of April, 1889, and as a consequence of the refusal of the defendant company to further handle, drive, or care for the logs owned by the plaintiff for the prices named in the contract, the plaintiff has been compelled to pay larger sums for the performance of the work necessary therefor, such additional payments amounting to 38½ cents per thousand feet, subject to reduction of the $250 per year, the contract price for driving; and I further find that plaintiff paid the sum of $350.27 as an extra charge for brailing in 1889, in addition to the total of 38½ cents increase.

"(9) I further find that at the date of the contract in question, to wit, August 23, 1882, the plaintiff had upon the banks or in the waters of the Flambeau and Chippewa rivers, below the forks thereof, logs and timber to the amount of 14,901,430 feet according to bank scale.

"(10) I find that since the said 23d day of August, 1882, the plaintiff has cut from the lands by him owned at the date of the contract, and placed in the waters of the Chippewa and Flambeau rivers, as provided in said contract, timber to the amount of 97,848,024 feet at bank scale, and that there was in April, 1889, standing uncut upon the said lands the further amount of 3,869,000 feet of pine timber at bank scale, and 724,000 feet of hemlock timber."

"(13) I find that in 1884 an extraordinary flood occurred in the Chippewa river, which brought about a change in the channel of the river, near the entrance to Beef Slough, and resulted in the filling up thereof. The defendant company made all reasonable efforts and expenditures to keep open said slough and the entrance thereto, but without avail; and finally, in 1889, Beef Slough was wholly abandoned, and since then it has not been used in connection with the logging business on the Chippewa river.

"(14) I find that, when it became apparent that Beef Slough was becoming unfit for booming purposes, a company was organized, under the laws of the state of Minnesota, for the purpose of creating and managing a boom at West Newton Slough, on the west bank of the Mississippi river; and booming facilities costing in excess of $100,000 were there created, and the logs coming down the Chippewa river have since then been run into and handled in West Newton Slough, instead of Beef Slough.

"(15) I find that the relations existing between the West Newton Boom Company and the defendant company are substantially the same as those existing between the defendant company and the Beef Slough Company.

"(16) I find that, by the use of the facilities created at West Newton Slough, the logs driven down the Chippewa river can be boomed, brailed, formed into rafts, and be delivered to towboats for transportation down the Mississippi river, but the expense thereof is somewhat in excess of what the same work cost at Beef Slough.

"(17) I find that the defendant failed to handle, as it was required to do under the contract, the sum of 42,238,799 feet of pine timber; and that the

additional cost for handling the same, which plaintiff has been compelled to pay or will be compelled to pay, equals the sum of $15,611.00 over and above the cost at contract rates. Shiras, District Judge."

In view of the foregoing findings, the circuit court decided that the plaintiff below was entitled to recover. 61 Fed. 893.

John J. Jenkins (H. H. Hayden, on the brief), for plaintiff in error.

J. A. Tawney and Francis B. Daniels (David B. Henderson, Louis G. Hurd, and George W. Kiesel, on the brief), for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

It was insisted on the oral argument of the case by counsel for the plaintiff in error, and the point is elaborated to some extent in the brief, that the circuit court erred in holding that the logging company was not relieved of its obligation to further perform its contract by the filling up of Beef Slough, which was occasioned, as it seems, by an extraordinary flood in the Chippewa river, that occurred in the year 1884. It was insisted that the filling up of the slough was an act of God, which rendered further performance of the contract impossible, and operated to discharge the same. This question was considered at considerable length in the opinion of the learned trial judge, and was decided adversely to the contention of the logging company on two grounds: First, for the reason that the flood which filled up the slough was an event which might reasonably have been anticipated, and against the occurrence of which the logging company ought to have protected itself by a proper stipulation in the contract; second, for the reason that the filling up of Beef Slough did not in fact render it impossible for the logging company to do substantially all that it had contracted to do. The circuit court held that by making use of some other slough near the mouth of the Chippewa river for the purpose of sorting and brailing logs, as the court held it had the right to do, the defendant company might have fulfilled all the obligations which the contract imposed. Robson v. Logging Co., 61 Fed. 893, 900, 901. The reasoning as well as the decision of the circuit court on this branch of the case meets with our approval; and, inasmuch as the alleged error is not specified in the assignment of errors in accordance with the requirements of rule 11 of this court (11 C. C. A. cii., 47 Fed. vi.), it will not be further noticed.

It is also contended that the contract sued upon lacked mutuality, and for that reason was not enforceable against the logging company. This is but another form of stating the proposition that the logging company's promise to take possession of all the plaintiff's logs and timber in the Chippewa river, and to drive the same down that river, and to brail and deliver them ready to be taken in tow by towboats, for a certain specified compensation, to be paid by the plaintiff, rested upon no consideration, because the plaintiff did not expressly promise to deliver any logs or timber to be so handled. We may concede it to be an elementary rule that, so long as a contract is wholly executory, neither party thereto is bound unless both are bound. A promise by one party to do a given act, nothing having

been done or paid in consideration therefor, cannot, as a matter of course, be enforced unless the opposite party either expressly or by necessary implication promises to do something in return. The rule in question is well illustrated by the following cases: Campbell v. Lambert, 36 La. Ann. 35; Railway Co. v. Dane, 43 N. Y. 240; Stensgaard v. Smith, 43 Minn. 11, 44 N. W. 669; Bailey v. Austrian, 19 Minn. 535 (Gil. 465); Mers v. Insurance Co., 68 Mo. 127; Chambliss v. Smith, 30 Ala. 366; Willetts v. Insurance Co., 45 N. Y. 45; Clark, Cont. 168, and cases there cited. We think, however, that the contract sued upon does not fall within the rule last stated. The special finding shows that, prior to the execution of the agreement, certain differences and disputes in regard to the handling of the plaintiff's logs and timber in the Chippewa river, and the prices to be paid therefor, had arisen between the parties to the contract. The contract also recites that it was entered into by the respective parties, "for the purpose of settling all said differences." Now, while the agreement does not expressly state that, when signed, it should operate as a settlement of past differences and a relinquishment of all claims growing out of previous transactions, yet, by necessary implication, such was the effect of the agreement when executed and delivered. By entering into the contract, the plaintiff evidently released and absolved the logging company from whatever claims he had theretofore preferred against it growing out of the transportation of logs and timber on the Chippewa river. By a necessary inference, that which was declared to be the purpose of the contract, to wit, the settlement of past differences, was accomplished when the contract was signed and delivered. Neither party could thereafter maintain an action against the other founded upon a claim that was then in controversy if it related to the transportation of logs or timber on the river in question. It results from this view that the contract in suit cannot be regarded as having been wholly executory when it was signed and delivered. By the very act of signing and delivering the agreement, the plaintiff manifestly released claims against the logging company, of some kind, that were then in dispute, which might have become the subject-matter of an action at law, if, indeed, a suit was not then pending. This in itself constituted a sufficient consideration for the defendant company's promise to drive and brail, for a specified price, such logs as the plaintiff might thereafter place in the Chippewa river. The point, therefore, that the contract was voidable when executed, for want of mutuality, in our opinion, is not well taken.

Another point that is urged with some force is that "the contract, being silent as to its duration, was terminable at the pleasure of either party." It is obvious, we think, from the relations of the parties and the circumstances under which the contract was executed, that if this idea that the contract might be terminated at the pleasure of either party had been suggested to the plaintiff or to the defendant, particularly to the former, prior to the execution of the agreement, it would never have been executed in its present form. The logging company had been engaged for some years in the business of driving logs down the Chippewa river, and in placing them

in booms or sloughs, where the logs of different owners could be assorted, brailed, and formed into rafts in a fit condition to be towed to their destination at various points on the Mississippi river. The work of sorting the logs was done by a boom company which was under the domination and control of the logging company, and was merely one of the subagencies by which that company placed the logs of different owners in the Mississippi river in a condition to be towed. This was not a temporary employment of the logging company in which it had been engaged for a few months or a single season, but it was its permanent occupation; and it is fair to infer from the special finding that it had created facilities for driving, booming, and assorting logs which probably gave it a monopoly of that business on the Flambeau and Chippewa rivers. The plaintiff, on the other hand, was the owner of a mill at Lansing, on the Mississippi river. He also owned some pine lands on the head waters of the Flambeau and Chippewa rivers, and drew his supply of logs largely from that source, and expected to do so for some years to come, until the supply was exhausted. He had previously employed the logging company to drive and brail such logs as were cut on his lands, and disputes had arisen as to the mode of doing the work, and as to the prices that ought to be charged therefor, which controversies the parties not only desired to settle, but to guard against the recurrence of similar disputes in the future. Under these circumstances, it would be unreasonable to suppose that the parties to the contract contemplated a merely temporary agreement which either could terminate at will. Such an agreement would not furnish adequate protection to either party against future controversies which both desired to avoid. It would not settle for any definite period the compensation to be paid for the services to be rendered by the logging company, which must have been a matter of vital importance to the plaintiff, inasmuch as the logging company controlled practically all the facilities on the Chippewa and Flambeau rivers for driving and sorting logs. Moreover, an agreement that could be terminated at the pleasure of either party might prove to be a very inadequate consideration for the settlement of claims growing out of past transactions that had been surrendered and discharged when the contract in suit was executed. Aside from these considerations, which render it highly improbable that an agreement was contemplated which could be terminated at any time, the contract, as made, contains provisions which clearly indicate that the parties expected it to continue in force for a period of some years at least. It contained a stipulation that the payments to be made by the plaintiff should be made "annually at the close of each season's business." It also contained a statement that the contract was entered into "for the purpose of settling differences and providing for the future," which latter clause would be clearly inapt if the contract was entered into with the understanding that either party might terminate it at his mere pleasure or convenience. We entertain no doubt, therefore, of the intention of the parties to make a contract of some years' duration, which in the meantime could not be revoked by either party. Nevertheless, the important question remains whether the contract,

when considered in relation to the circumstances under which it was made, furnishes the means of determining its possible duration. This inquiry is essential, because, when a contract calls for the rendition of services, if it is so far incomplete that the period of its intended duration cannot be determined by a fair inference from its provisions, either party is ordinarily at liberty to terminate it at will on giving reasonable notice of his intention to do so. Irish v. Dean, 39 Wis. 562; Coffin v. Landis, 46 Pa. St. 426, 430. See, also, Wood, Mast. & S. 265, and Mechem, Ag. § 210.

For the reasons that we have already suggested, we have reached the conclusion that it may be fairly inferred from the terms of the agreement, and from the circumstances which led to its execution, that the parties to the instrument intended that it should continue in force and remain operative as long as the plaintiff was actively engaged in removing the timber from the lands which he then owned on the head waters of the Flambeau and Chippewa rivers. The fact that the plaintiff owned lands thus located, and found it necessary to make use of the Chippewa river as a vehicle of transportation; the fact that the logging company was engaged in the business of driving and assorting logs, and that it controlled most of the facilities for doing that work successfully; and the further fact that controversies had arisen, and were liable to arise in the future as long as the parties occupied such relation,—were the several circumstances which led to the execution of the contract. So far as appears, neither the plaintiff nor the logging company had any intention, when the contract was signed, of abandoning the business in which they were respectively engaged; and neither party seems to have anticipated a change in their relations or in the existing mode of doing business that would render the provisions of the contract inequitable or burdensome for some years to come. It was doubtless expected that in the course of a few years the timber on the lands then owned by the plaintiff would be exhausted; that the conditions that had given birth to the agreement would then cease to exist; and that on the happening of that event, and not before, it would cease to be operative. There is nothing in the provisions of the contract or in the situation of the parties that would warrant us in holding that it was probably intended that the logging company should have the right to terminate the contract before the plaintiff had exhausted the timber on the lands which he then owned, while there are very persuasive reasons to support the contrary view, that it was contemplated by the parties that it should remain in force until that event had transpired. It is a fundamental rule that, in construing a contract, effect should be given to the intention of the parties, and that in ascertaining that intention the court should place itself, as nearly as possible, in the position that they occupied when the contract was made. It frequently happens that the full scope and purpose of an agreement cannot be accurately ascertained without considering the subject-matter to which it relates and the circumstances under which it was executed. When a case of that kind occurs, and the necessity arises for going outside of the language employed, for the purpose of ascertaining its meaning or the probable intention of the parties thereto, a court is always privileged to do so,

and may properly consider any fact or circumstance which sheds light on the transaction. The case at bar is one which, in our judgment, demands a liberal application of this doctrine. While the parties to the contract have failed to state how long it should continue in force, they have, nevertheless, manifested an intention to enter into a business arrangement with each other which should last for some years and until a certain expected event had occurred. We think, therefore, that the happening of that event should be held to limit the duration of the contract, and that until such time the logging company remains bound by its provisions.

A number of exceptions were also taken to the action of the trial court in admitting testimony. As the case was tried by the court, without the intervention of a jury, none of these exceptions seem to us to be of sufficient importance to deserve special notice, save one, which relates to the introduction of certain scale books that were offered for the purpose of showing the quantity of logs that had been cut from the plaintiff's land. The circuit court considered the admissibility of this testimony at some length, and, as we fully concur in the view taken by the trial court, we cannot do better than quote the following passage from its opinion:

"The evidence shows that as the logs are cut in the woods they are scaled—that is, measured to ascertain their contents—by persons known as 'camp scalers,' and the measurements are entered upon cards. At the close of the day the measurements thus taken are entered upon the scale book. From time to time, inspectors visit the camps, and verify the contents of the scale books by counting and remeasuring a sufficient portion of the logs to satisfy them of the correctness of the books. If errors are detected, the book is corrected. After verification and correction by the inspectors, the scale book is sent to the owner of the logs, and payment is made to the log cutters and handlers according to the contents of the book, which is thus made the evidence upon which the owner of the logs must make payment to his employés. It is clearly to the interest of the log owner that these scale books shall not show the cutting of any greater number of logs than the facts will justify. The mode by which the entries are made on the scale book is such as to assure accuracy therein. The parties who cut and haul the logs, and the owner, who is to pay for the cutting and hauling, act upon the contents of the books, and deem them to be proper evidence of the facts therein stated. That which is received and acted upon by persons engaged in any line of business as competent evidence is ordinarily admissible when the same fact becomes a matter of inquiry in judicial proceedings. It would seem, therefore, that the scale books should be admitted in evidence, unless it appears that there is better evidence within the power of plaintiff to produce. It is said that the camp scalers should have been hunted up, and their testimony be introduced, in order to show the number of logs, and the contents thereof, cut on plaintiff's land during the time in controversy. What is sought to be proved is the result, in number and quantity, of the logs cut. When the scalers made the count and measurement, two records thereof were made,—one in the memory of the scaler, the other in the scale book. Which is now the best evidence? Years have elapsed. The entries on the scale books remain unchanged. They are now just what they were when originally made. Can the same be said of the record made upon the memory of the scalers? If the scalers had been produced, and had testified that in the years past they had counted and measured a large quantity of logs, and had at the time entered the results upon scale books prepared for the purpose, and that, as they now remembered it, the number and quantity were so and so, but, upon the production of the scale books, they showed a different quantity and measurement, which should control? The rule requiring the production of the best evidence of which the case is susceptible is intended to guard against fraud and mistake, and to aid in arriving at the truth. That

evidence which is the least liable to mislead is the best evidence; and it cannot be maintained that there is more reliable evidence of the number and quantity of the logs cut upon plaintiff's land than the scale books wherein the entries were made from day to day by the camp scalers, and which were revised and corrected by the inspectors. The books were properly identified, and the inspectors who revised them at the different camps testified to their correctness; and, under these circumstances, I hold that the books cannot be excluded upon the ground that it appears that there is better evidence adducible upon the question of the number and quantity of logs cut by plaintiff, and placed in the waters of the Chippewa and Flambeau rivers."

For the reasons so well stated by the trial judge, we entertain no doubt that the scale books in question were properly received in evidence. They appear to have been kept under conditions that were calculated to prevent mistakes therein, and to insure a high degree of accuracy. They were also identified by witnesses who were familiar with their contents, and whose special duty it was to see that they were properly and accurately kept. Under these circumstances, we think that the trial court would have erred if it had excluded the books on the ground that they had not been sufficiently identified, or that they were not the best evidence. Finding no error in the action of the circuit court to which our attention has been specifically directed by the assignment of errors, the judgment of the circuit court is hereby affirmed.