MANUFACTURERS NATIONAL BANK

*vs.*

HOLLINGSWORTH & WHITNEY COMPANY.

Androscoggin.     Opinion December 20, 1909.

*Evidence.   Memoranda.   Logs and Lumber.   Contract.   Scale.   Assignments.*
*Liability of Debtor.*

Where a scaler agreed upon by the parties uses an assistant who measures and scales logs in accordance with the scaler's instructions and directions, and who enters on scale pads the separate contents of each log scaled by him, which pads the scaler examines and tests from time to time and signs, adopts and uses as the memoranda of his scale, and identifies them in court as the pads so made by his assistant and adopted by him, such pads are admissible without producing the assistant who made them.

The scale of a scaler agreed upon by the parties is not to be disregarded because an assistant performed some of the work necessary to be done in making the scale.   The data obtained by his assistants in their measurements and scale of the logs, and the entries and memoranda thereof made by them, acting under his direction, and inspected, corrected and adopted by him, may be used by the scaler in ascertaining the quantity of logs scaled.

In the absence of fraud or mathematical mistake the scale of a scaler agreed upon by the parties is conclusive, and the burden is upon the party attacking the scale to prove such fraud or mistake.

*Held:*   That the evidence offered in the case at bar to set aside the scale of the scaler agreed upon by the parties falls far below that degree of proof essential to establish fraud, bias or prejudice on the part of the scaler; neither is it shown that there was any mathematical mistake.

An agreement by the defendant November 26, 1902, to pay a bank amounts becoming due from the defendant to a firm during the current season on a logging contract which ran for four years, only bound the defendant as to amounts falling due the firm during the logging season of 1902-3, not applying to left-over logs, since under the logging contract nothing became due on them during that season, and the bank could not recover on a quantum meruit as to such left-over logs, nor did the agreement prevent the defendant from giving the firm a check to pay labor bills, from taking over a loan to the firm made by defendant's employee, or from buying supplies of the firm.

On report. Judgment for defendant.

Assumpsit on a contract arising out of a written acceptance by the defendant of an order given by J. S. Longley & Son for the payment to the plaintiff of such amounts as should become due them under their logging contract with the defendant. The writ also contained a count for a quantum meruit. Plea, the general issue with a brief statement alleging that the defendant "paid to the plaintiff all that it assumed to pay to the plaintiff." At the conclusion of the evidence, the case was reported to the Law Court, upon so much of the evidence as was legally admissible, "to determine both the law and the facts and to render judgment accordingly."

The case is stated in the opinion.

*Newell & Skelton*, for plaintiff.

*Norman L. Bassett*, for defendant.

SITTING: WHITEHOUSE, SAVAGE, SPEAR, KING, BIRD, JJ.

KING, J. This case is before the Law Court on report. It is an action of assumpsit on a contract arising out of a written acceptance by the defendant of an order given by J. S. Longley & Son for the payment to the plaintiff of such amounts as should become due them under their logging contract with the defendant. The writ also contains a count for a quantum meruit.

May 4, 1901, J. S. Longley & Son entered into a written contract with the defendant to cut, haul and drive logs for the next four succeeding seasons. The logs were to be cut on Misery Township, Somerset County, Maine, landed in Chase Stream and Indian Pond, and driven into the East Branch of Kennebec River. They were to be scaled at sound scale by a competent scaler, mutually agreed upon. The 9th paragraph of the contract reads:

"9th. Said party of the first part hereby agrees to pay, and said party of the second part to receive, as full compensation for the services herein specified, the sum of five dollars and fifty cents ($5.50) per thousand feet for that part hauled into Chase Stream and six dollars ($6.) per thousand feet for that part hauled into Indian Pond, sound survey for all logs so cut, hauled and driven, payments

to be made as follows: $4. per thousand feet April 1st of each season for the amount of logs which in the estimation of the scaler are cut, yarded and landed at that date, and the balance as it may appear by the scaler's bills, when said logs are driven and delivered at the place of delivery above specified: provided, however, said party of the first part is satisfied that all bills for which a lien upon said logs could be claimed, have been paid and discharged by said party of the second part, and said party of the first part shall not be obliged to pay said balance until it is satisfied of said fact. In case only a portion of said logs are driven and delivered the first season, then said party of the first part shall pay said balance per thousand for such quantity of logs only as are so driven and delivered, and shall retain the balance until the remainder of said logs are driven and delivered by said party of the second part, and said party of the first part is satisfied that all liens, claims and demands have been paid and discharged."

Before beginning the second season's operation under the contract, the Longleys, on Nov. 20, 1902, gave to the defendant this order:

"Please pay to the Manufacturers National Bank of Lewiston, Maine, all that may be due us under the terms of contract with you for hauling and driving logs until otherwise notified by the Directors of said Bank."

Nov. 26, 1902 the defendant wrote the plaintiff bank:

"We have received an order from J. S. Longley & Son to pay you such amounts as shall become due on their contract with us this season, and will forward to you such amounts as become due as requested."

A portion only of the logs cut during the winter of 1902-3 were hauled and driven, the rest being left on the "yards" in the woods.

Two questions are presented; First, did the defendant pay to the plaintiff all that became due under the contract with the Longleys for the logs hauled and driven? Second, was the defendant required under its contract of acceptance to pay the plaintiff anything on account of the logs that were cut during the winter of 1902-3 but left over on the "yards?"

1.    A. D. Heald, of Gardiner, was agreed upon as the scaler for
the operation of 1902-3.    According to his scale bills the amount
of logs that the Longleys succeeded in hauling and driving that
season was 2,768,630 feet, amounting at the contract price to
$15,227.46.    The defendant had from time to time during the
operation made payments to the plaintiff aggregating $16,000,
an amount somewhat in excess of the contract price for the logs
actually driven.

The plaintiff, however, claims that a much larger quantity of
logs was hauled and driven than Mr. Heald's scale bills show, and
much evidence was presented relative to that issue.    It will not be
practicable or perhaps useful to attempt here an extended analysis
and discussion of that evidence, but only to refer briefly to that
which shows the method and manner of Heald's scale, and that
which the plaintiff claims discredits that scale.

The logs hauled were landed on Chase Stream in three separate
landings, designated by the surveyor by numbers.    No. 1 landing
was the upper one.    Nos. 2 and 3 were practically one, being on
opposite sides of the stream, and about one mile below No. 1.

Mr. Heald testified that he was "sixty-eight years old," had
"scaled thirty-five consecutive winters," and "for about every one
on the Kennebec River."    He began scaling at No. 1 landing on
Jan. 10, 1903, and used the "Five Lined Holland Log Rule" called
for in the contract, applying "the common method of surveying
logs."    He used scale pads, so called, on which was kept the data
of the scale as the work progressed.    These are small sheets or
slips of paper made for the purpose, each being ruled into 200
small squares or checks, and in each square is entered in figures the
contents of a separate log as surveyed.    He continued scaling alone
at No. 1 landing until Jan. 28 when C. G. Aldrich came as his
assistant.    Heald worked with Aldrich one day, instructing him,
and ascertaining and testing his method and efficiency.    He says:
"I scaled the same logs he scaled, so as to compare with him; see
how he scaled them, and how they agreed with my work."    He
then left Aldrich to scale on No. 1 landing as his assistant, for
whose scale he was responsible, and went to landings 2 and 3 to

scale there.   From time to time Heald went to No. 1 landing and inspected Aldrich's work to see that the scale was being done right, and he approved and adopted it as his scale.

There were 82 scale pads filled at No. 1 landing, 73 of which were signed by Mr. Heald, the other 9 being unsigned.   The pads filled between January 10 and 28 represent data obtained by Heald personally, the data for the others having been obtained by his assistant, Aldrich, under his direction, and those pads Mr. Heald corrected, adopted, signed and retained as the detailed memoranda of his scale, and from time to time he sent them, or copies of them, to the defendant and the Longleys.

The method of scaling at the other landings was the same.   As to No. 2 landing Mr. Heald testified:  "I say I scaled them all. I did, but the pads don't show it.   Henry Wilson's pads I accepted for a certain length of time.   We both scaled together through the whole hauling season.   He scaled the same logs I scaled and I accepted his pads up to No. 32—about 32 pads—and sent them into the office  .  .  .  .   after the 32 that I speak of, I stopped sending in his pads and sent in my own pads."   At landing No. 3 a helper assisted Mr. Heald in getting the lengths of the logs, but Heald took the diameters of all, made the scale, and filled out all the pads excepting "just a few pads that he (Wilson) personally scaled."   The record shows only one pad from No. 3 landing signed by Wilson.

After the scale was completed Mr. Heald rendered to each party to the logging contract a final scale bill showing that he had scaled 36,082 spruce logs at 2,664,480 feet, 337 pine logs at 54,620 feet, and 939 cedar logs at 49,530 feet, a total of 2,768,630 feet.

Objection was made by plaintiff to the admission of the scale pads, on the ground that Mr. Heald, the surveyor agreed upon by the parties, did not personally perform all the labor in making the scale of the logs as represented on the pads, but that some of it was done by assistants who were not called to identify those pads made out by them and verify their correctness.

As the case is to be determined here on so much of the evidence only as is legally admissible, it is of little consequence whether all

the pads were strictly admissible, for the testimony of Mr. Heald, the surveyor, and his final scale bill, amply show the method, manner and quantity of his scale.    But we think the objection is without merit, and that upon both reason and authority the pads were properly received in evidence.    They were original entries made by a person in the regular course of business whose duty it was to make them.    They were made under conditions calculated to prevent mistakes and insure accuracy.    They were identified by Mr. Heald as those used in the work of scaling.    The larger part of them he personally made out, and the rest were made under his direction, by his assistants, whose work he inspected and tested from time to time and adopted as his.    Practically all the pads were signed by him, and kept and used by him as the original memoranda of his scale.    It would seem that no further proof of their genuineness ought reasonably to be required.

Speaking of the admissibility of such and similar entries without their verification on the stand by all the persons who were concerned in their making, Wigmore in his work on Evidence, section 1530, says : "Such entries are dealt with in that way in the most important undertakings of mercantile and industrial life.    They are the ultimate basis of calculation, investment, and general confidence in every business enterprise; nor does the practical impossibility of obtaining constantly and permanently the verification of every employee affect the trust that is given to such books.    It would seem that the expedients which the entire commercial world recognizes as safe could be sanctioned, and not discredited, by courts of justice. When it is a mere question of whether provisional confidence can be placed in a certain class of statements, there cannot profitably and sensibly be one rule for the business world and another for the court room."

In *Mississippi River Logging Co.* v. *Robson,* 69 Fed. 773, a case directly in point, the logs were scaled by "camp scalers" so called, who entered the measurements first on cards and at night transcribed them upon scale books.    From time to time inspectors visited the camps and examined the scale books, verifying them by measuring some of the logs.    The inspectors identified the scale

books and testified to their correctness. It was held that the books were admissible without producing the camp scalers, the court saying: "They appear to have been kept under conditions that were calculated to prevent mistakes therein, and to secure a high degree of accuracy. They were also identified by witnesses who were familiar with their contents, and whose special duty it was to see that they were properly kept. Under these circumstances we think that the trial court would have erred if it had excluded the books on the ground that they had not been sufficiently identified, or that they were not the best evidence."

Neither can the plaintiff's contention be sustained that Mr. Heald's scale is to be disregarded because other persons assisted him, and he did not personally perform all the work necessary to be done in making the scale. It would be quite impossible for one person to measure and survey each log in a lumbering operation amounting to several millions, especially when there were several landings at some distance apart. It was, therefore, to be expected that the surveyor for this large operation would require helpers and assistants, for the work to be done demanded it. Such, too, is the custom followed in the scaling of logs in large lumbering operations in this State. The data obtained by his assistants in their measurements and scale of the logs, and the entries and memoranda thereof made by them, acting under his direction, and inspected, corrected and adopted by him, may be used by the scaler in the determination of the quantity of logs scaled. *M. D. & I. Co.* v. *Allen Clothing Co.*, 102 Maine, 257, 260.

The plaintiff further claims that Mr. Heald's scale did not give the full contents and quantity of the logs, and for that reason it should not control. But in the absence of fraud or mathematical mistake the scale of the scaler agreed upon by the parties is conclusive, and the burden is upon the party attacking it to prove such fraud or mistake. *Atwood* v. *Mfg. Co.*, 103 Maine, 394; *M. D. I. Co.* v. *Allen Clothing Co.*, supra; *Nadeau* v. *Pingree*, 92 Maine, 196.

We think the plaintiff has failed to sustain this burden. Mr. Heald was a scaler of long experience and good reputation. He

was selected by the parties, and no reason is suggested why he should be unfair. The method he employed was calculated to prevent mistakes, and it is not made to appear wherein any mistake was made.

An examination of his scale bills show a scale of 36,082 spruce logs making a total of 2,664,480 feet, an average of 13.54 logs per thousand. That portion of the logs left over on the yards in the woods were scaled in 1904 on the landings by Edward Ireland, a scaler agreed upon by the parties. His scale bills show that he scaled 22,217 spruce logs making 1,651,820 feet, an average of 13.45 logs per thousand. This small difference between two independent scales of logs, cut at the same time and in the same operation, and made at different times and by different scalers, both having been mutually selected by the parties, is a convincing circumstance in answer to a claim of fraud or mathematical mistake in the Heald scale.

The plaintiff claims to have introduced evidence tending to show that the logs did in fact run at about an average of $11\frac{1}{2}$ per thousand. We have examined with care the testimony of the witnesses called by the plaintiff on this point, and we do not find in it sufficient proof of facts and circumstances that reasonably discredit either the fairness or accuracy of the Heald scale.

George Gordon, who hauled the left-over logs, from his observation of the logs only, estimated that it would take "about eleven and one half" per thousand. James O'Brien, from his observation while working on the logs as a river driver, estimated about eleven per thousand. William E. Drewry, called by the plaintiff on this point, actually scaled on No. 1 landing 17,269 pieces making 1,151,330 feet with an average of "over fifteen to a thousand." He gave as an explanation why his scale took two more logs per thousand feet than the Heald scale, that many long logs were cut into two on the landing. But the scale of Heald included the same logs. Joseph Bairlargeon, who had charge of the camps, estimated "eleven and a half perhaps." He scaled, however, one day only and his total for that day was 500 feet less than the Heald scale for the same day. Urban Spaulding scaled the left-

over logs on the yards in the woods and his average was "about eleven." But he scaled "at the bigness," which means that he made no allowance for unsoundness. The contract, however, called for a "sound scale" and this was the scale made by Heald. Herein, and in the fact that many long logs were cut in two after being hauled, is to be found sufficient reason to account for Spaulding's smaller average. Henry M. Wilson, who scaled on No. 2 landing through the hauling season, along with Mr. Heald, but as an independent scaler, testified that he took an average of "practically eleven." With respect to Wilson's scale it is to be noted that of the 75 scale pads filled out at No. 2 landing, the first 32 sent to the defendant and put in evidence were Wilson's, which Heald adopted. This fact would tend to show that there could have been no material difference between their scales, at least during the first part of the scaling. The average of the Heald scale was that of all the logs on all the landings combined. That of Wilson was only of those on No. 2, and this undoubtedly accounts for the difference in the averages, for the result of Drewry's scale shows that the logs on the upper landing must have been smaller than those on the other landings. In *Bailey* v. *Blanchard*, 62 Maine, 168, 171, the court, speaking of the conclusiveness of the scale of a scaler agreed upon, said: "Neither party is at liberty to set it aside or impeach it, except upon such evidence as would avoid the award of an arbitrator mutually chosen—evidence which will satisfy the jury that the scaler acted corruptly, or that injustice is done by reason of some bias, prejudice, or foul practice in the procurement of it." The evidence offered by the plaintiff here to set aside the scale of the scaler agreed upon by the parties falls far below that degree of proof essential to establish fraud, bias or prejudice on the part of the scaler in making the scale. It is also to be observed in this connection that the contract expressly provides that in case of dissatisfaction as to the scale the parties would then agree upon a committee to test the scale. If there was any dissatisfaction with the scale as the work progressed, it does not appear that any effort was made to have the scale tested in the manner provided for in the contract.

It is, therefore, the opinion of the court that the scale of Mr. Heald, the scaler agreed upon by the parties, must control and is conclusive as to the quantity of logs driven in during the season of 1902-3, and the case shows that the defendant paid to the plaintiff all that became due under the contract for those logs.

II.  With respect to the left-over logs, the plaintiff claims in its writ that the defendant is liable to it for the cutting and yarding of 2,500,000 feet of logs at $3.50 per thousand.

The following facts and circumstances seem necessary to be stated as somewhat explanatory of this claim, and of the contentions of the learned counsel for the plaintiff in argument.

April 16, 1903, the defendant, at the urgent request of the Longleys, and upon their representation that the money was needed to pay labor bills, gave the Longleys a check for $5000.  No part of the proceeds of this check was turned over to the plaintiff, and $2000 of it appears to have been used to take up a note which had nothing to do with the lumbering transaction.  The Longleys still requested further assistance from the defendant to pay the men on the drive.  This request was not directly granted, but on May 1, 1903, W. J. Lanigan, who then was and for a long time had been in defendant's employ, and was the representative of the defendant through whom the Longleys chiefly negotiated, loaned them $3000, taking their note therefor on one year secured by a mortgage of their teams and lumbering outfits.  On May 9, 1903 this note and mortgage was transferred by Lanigan to the defendant.  The plaintiff was not informed either of the $5000 check or the Lanigan loan.

In the line of a suggestion of the Longleys for a readjustment of the logging contract "so that we can come out whole in the future if possible" negotiations between them and the defendant resulted, on September 28, 1903, in an agreement whereby the logging contract was cancelled, and the defendant was to take over the supplies and outfits of the Longleys for $1850, pay them $700 on account of a dam they had built, and pay them "at the rate of $3.50 per M ft. for yarding the logs which are now on the yards, after we haul them on to the landings and scale them."  The plaintiff was not informed of this new arrangement.

The defendant claims that the quantity of logs so taken by it on the yards, according to the scale made on the landings after they were hauled in the winter of 1903-4, was 1,708,870 feet, for which it credited the Longleys, at $3.50 per M, $5,981.05. The defendant's account with the Longleys for the operation of 1902-3, as presented in the record, shows disbursements of $24,000, made up of the $16,000 paid to the plaintiff, the $5000 check given to the Longleys, and the $3000 Lanigan loan. Against this is credited, for the logs driven in the spring of 1903, $15,227.46, for work on road, $69.15, for account of dam, $700, for supplies, etc., $1850, and for the left-over logs at $3.50 per M, $5,981.05, a total of $23,777.66, leaving a deficit of $222.34.

It is claimed in the brief of the plaintiff that in giving to the Longleys the $5000 check, in taking over the Lanigan loan of $3000, and in purchasing the supplies for $1850, the defendant diverted the payments of those sums from the plaintiff wrongfully. But it should need no argument, we think, to make it apparent that unless those amounts became due under the logging contract, the fact that the defendant paid them to the Longleys would not make it liable to the plaintiff for them under its contract of acceptance of the Longley order. Nor do we perceive in what manner those specific transactions can have any material probative value in the determination of the question of the extent of the defendant's liability under that acceptance, for if its liability included the payment of something on account of the left-over logs the amount of such payment would not be determined or controlled by those transactions.

The question of the extent of the defendant's obligation to the plaintiff involves, perhaps, a consideration (1) of whether the Longley order and the defendant's letter of Nov. 26, 1902 are to be construed and treated as an assignment to the plaintiff, binding upon the defendant, of all amounts that should become due under the logging contract until otherwise notified by the directors of the plaintiff bank, and if so what would be the extent of its liability thereunder, and (2) of whether the defendant's liability under its letter is limited to payments of such amounts only as became due that season,

The Longley order would, no doubt, in equity, be treated as an equitable assignment of the moneys to become due under the contract until otherwise notified by the bank.   But this is an action at law, and not a bill in equity to enforce obligations and secure rights under an equitable assignment.   The effect, however, of such an assignment, if made, would have been merely to put the plaintiff in the Longleys' place, and subrogate it to their rights to receive such amounts as should become due under the contract.   "Neither in law nor in equity will an assignment by one contracting party of his interest in a contract or of money due or to grow due thereon enure in favor of the assignee, to deprive the other party of the benefit and advantage of the terms and conditions contained in the contract."   *Bernz* v. *Marcus Sayre Co.*, 52 N. J. Eq. 275, 283. Even if the plaintiff could rely here upon the doctrine of an equitable assignment to determine the defendant's obligation to it, then the defendant could not be found liable in the premises, for there was not at the time of the order, and has not been since any money due under the terms of the logging contract which, if the order had not been given, the Longleys could have recovered of the defendant, except for the logs driven in the spring of 1903 which was paid to the plaintiff.   There was then no money in the hands of the defendant,—no fund to which the assignment attached.   *Goldengay* v. *Smith*, 62 N. J. Eq. 354.

But the defendant's liability to the plaintiff does not depend upon the application of the doctrine of an assignment to the plaintiff of the Longley's rights to payments under the contract until such time as the bank should otherwise notify.   The obligation of the defendant to the plaintiff arose upon the contract expressed in its letter of Nov. 26, 1902.   By that letter the defendant agreed "to pay to you such amounts as shall become due on their contract with us this season."   There is no uncertainty about the meaning of that engagement.   It was limited in the time of its application. It included no other season except the one then ensuing—the logging season of 1902-3..   The defendant was not bound to enter into any express promise to make payments to plaintiff, but it was its

right, in making such promise, to limit it, and fix the period during which it should be in force, and having done so its obligation is measured thereby.

It remains only necessary to refer to the express provisions of the logging contract to ascertain that no payments became due thereunder during the logging season of 1902-3 for the logs cut and yarded but not hauled. It is provided in the contract that on April 1st, of each season a payment of $4 per thousand should be made on account of all logs "which in the estimation of the scaler are cut, yarded and landed at that date." Nothing was to be paid under this provision unless the logs were landed, that is hauled to the stream. And in the ninth paragraph of the contract it is expressly provided that if a portion of the logs are not driven the defendant shall not be required to pay the final payment on such logs until they are driven and it "is satisfied that all liens, claims and demands thereon have been paid and discharged."

There is no ground on which the plaintiff can recover anything under the count for a quantum meruit. It was no fault of the defendant that the Longleys did not haul and drive the logs left over, and the cancellation of the contract was at their suggestion, and voluntary on their part. Before the new arrangement was made under which the defendant agreed to allow the Longleys $3.50 per M, for the left-over logs, they could not have recovered of the defendant on a quantum meruit for the cutting and yarding of those logs. *Homer* v. *Shaw*, 177 Mass. 1, 5, and cases cited. If the Longleys could not have recovered on a count for a quantum meruit, provided the order had not been given, then the plaintiff cannot recover under such count.

It is, therefore, the opinion of the court that the plaintiff is not entitled to recover in this case, and the entry must accordingly be,

*Judgment for defendant.*