FEUCHTWANGER et al. v. MANITOWOC MALTING CO.

(Circuit Court of Appeals, Seventh Circuit. April 11, 1911.)

No. 1,684.

1. CONTRACTS (§ 10*)—REQUISITES AND VALIDITY—MUTUALITY OF OBLIGATION.
    A contract by which the first party agreed to malt for the second party during the season "from 400000 bu. to 500000 bu. of barley," and to ship the malt monthly, and the second party agreed to pay for the work monthly, is not unilateral, but by necessary implication the second party undertook to furnish during the season a minimum quantity of 400,000 bushels of barley to be malted under the contract.

    [Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 21–40; Dec. Dig. § 10.*]

2. CONTRACTS (§ 346*)—PLEADING ISSUES.
    Evidence to show a modification of a written contract or a waiver of a provision thereof is not admissible, unless such modification or waiver was pleaded.

    [Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1718–1753; Dec. Dig. § 346.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. EVIDENCE (§ 555*)—BREACH OF CONTRACT—DAMAGES.
    In an action for breach of a contract, by which plaintiff agreed to malt a minimum number of bushels of barley for defendants during the season at a stated sum per bushel, where the breach consisted in the refusal of defendants to furnish the barley, on the question of damages, the testimony of an expert accountant showing the cost per bushel of malting in plaintiff's plant during the season, together with an estimate based on proven facts of how much the actual cost would have been reduced if defendants had performed their contract, was not inadmissible because the transactions recorded in large part took place after the breach and after suit brought. Such estimate was not admissible, however, where it was based in part on hearsay evidence and in part on book entries not properly proven or for other reasons not themselves admissible.
    [Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2376; Dec. Dig. § 555.*]

4. TRIAL (§ 412*)—RECEPTION OF EVIDENCE—EXCEPTION—WAIVER.
    An exception to the admission of incompetent evidence is not waived because the objecting party endeavors to break its force by cross-examination.
    [Ed. Note.—For other cases, see Trial, Dec. Dig. § 412.*]

In Error to the Circuit Court of the United States for the Eastern District of Wisconsin.

Action at law by the Manitowoc Malting Company against Joseph Feuchtwanger, Henry Feuchtwanger, and Aaron Feuchtwanger. Judgment for plaintiff (169 Fed. 983) and defendants bring error. Reversed.

For a number of years prior to 1907, plaintiffs in error, sellers of malt, had employed defendant in error to convert their barley into malt. To cover the season from October 1, 1907, to October 1, 1908, they entered into the following contract:

"This agreement made this 12th day of September, 1907, between the Manitowoc Malting Co., a corporation created under the state laws of Wisconsin, party of the first part, and Feuchtwanger Bros., of Pittsburgh, Pa., parties of the second part.

"The party of the first part agrees to malt in first class manner for the parties of the second part from 400,000 bu. to 500,000 bu. of barley, and further agrees to deliver the said malt made from this barley free on board cars at their plant with the understanding that the party of the first part will deliver this contract in regular monthly shipments dividing the total amount of malt by 12 which will constitute regular monthly delivery. Party of the first part agrees to deliver to the party of the second part all the skimmings, screenings and sprouts from said barley and malt, and will sell same for their account giving them proper credit. In consideration of the fulfillment of this contract the party of the second part agrees to pay the sum of 13½ cents per bushel for each bushel of barley actually steeped. In this charge there is included the free storage of all barley and malt delivered and to be delivered. This contract covers the season of 1907 and 1908. It is further agreed that the parties of the second part will pay to the party of the first part a certain sum of money as agreed upon between them for wear and tear, and loss on the bags furnished the party of the second part, and, also, to pay all freight on the return of empty bags. The party of the second part agrees to pay to the party of the first part their malting commission monthly."

Disagreements arose, and by February, 1908, the contract was admittedly breached; each party claiming that the other was at fault. In March, 1908, defendant in error began this action to recover the profit it would have made if plaintiffs in error had fully performed. It laid its damages at $10,000. Plaintiffs in error, as defenses, charged that defendant in error had committed the first breach, and that plaintiffs in error had justifiably rescinded the contract on March 1st.

On the basis that the contract required plaintiffs in error to furnish during the year a minimum of 400,000 bushels, there was a failure to furnish 322,581 bushels. If the contract had been performed, defendant in error would have received 322,581 times 13½ cents, or $43,748.43; and its gain would have been the difference between that sum and the cost of malting. In proof of cost, defendant in error introduced a tabulation made by an expert accountant and his testimony in connection therewith. The tabulation purports to show the cost of converting one bushel of barley into malt at defendant in error's plant for the year ending September 30, 1908. The action was begun in March, 1908, but was not tried until in 1909. The calculation was based on an "actual steep" of 1,121,275 bushels." "Direct expense" was given as "labor, $19,838.70, and coal, $16,336.94." "Indirect expense" covered items of salaries, general expense, taxes, insurance, depreciation, and 5 per cent. interest on investment, aggregating "$51,372.59." For 1,121,275 bushels the direct expense was therefore $.032226 and the indirect $.04582 per bushel. The expert's tabulation then proceeded to give the cost "based on capacity of plant, 1,500,000 bushels." The indirect expense was thereby reduced to $.03425 and the total cost to $.06651 per bushel. On the basis that, if the contract had not been broken, the actual steep would have been 1,121,275 plus 322,581 bushels, the jury, from the expert's tables, figured that the cost per bushel would have been $.06784, and that defendant in error was therefore entitled to "damages on 322,581 bushels at $.06716, $21,664.54." There were repeated objections, in effect, that the whole matter, so far as the expert was concerned, was hearsay, and that defendant in error had not by other evidence laid the proper foundations for bringing the expert's tabulations and his testimony in explanation thereof within the exceptions to the hearsay rule.

Certain sections of the Wisconsin Revised Statutes of 1898, adopted by rules of the court below, read as follows:

"Sec. 4186. Whenever a party in any cause or proceeding shall produce at the trial his account books and swear that the same are his account books, kept for that purpose: that they contain the original entries of charges for goods or other articles delivered, or work and labor or other services performed or materials found, and that such entries are just, to the best of his knowledge and belief; that said entries are in his own handwriting and that they were made at or about the time said goods or other articles were delivered, said work and labor or other services were performed or said materials were found, the party offering such book or books as evidence, being subject to all the rules of cross-examination by the adverse party that would be applicable by the rules to any other witness giving testimony relating to said book or books, if it shall appear upon the examination of said party that all of the interrogatories in this section contained are satisfactorily established in the affirmative, then the said book or books shall be received as presumptive evidence in proof of the charges therein contained.

"Sec. 4187. Whenever the original entries mentioned in the preceding section are in the handwriting of an agent, servant or clerk of the party the oath of such agent, servant or clerk may in like manner be admitted to verify the same, and said books shall be testimony in the same manner as the books mentioned in the preceding section; provided, that such books mentioned in this and the preceding section shall not be admitted as testimony of any item of money delivered at one time exceeding five dollars, or of money paid to third persons, or of charges for rent."

"Sec. 4189. Any entries made in a book by a person authorized to make the same, he being dead, may be received as evidence in a case proper for the admission of such books as evidence. Entries in a book or other permanent form, other than those mentioned in sections 4186 and 4189b, in the usual course of business, contemporaneous with the transactions to which they relate and as part of or connected with such transactions, made by persons authorized to make the same, may be received in evidence when shown to have been so made upon the testimony either of the person who made the same, or if he be beyond the reach of a subpœna of the trial court or insane, of any person having custody of the entries and testifying that the same were made by a person or persons authorized to make them in whose handwriting

they are, and that they are true and correct to the best of his knowledge and belief. In case such entries are, in the usual course of the business, also made in other books or papers as a part of the system of keeping a record of such transactions, it shall not be necessary to produce as witnesses all of the persons subject to subpœna who were engaged in the making of such entries: but before such entries are admitted the courts shall be satisfied that they are genuine and in other respects within the provisions of this section."

Section 4189b has reference to the books of banks,

The process of melting takes from 8 to 12 days.

After a motion for a new trial was overruled, the court permitted defendant in error to amend its demand for damages to correspond with the verdict, and judgment was then entered.

The further facts necessary to be noted are stated in the opinion.

A. L. Hougen, C. E. Brady, John J. Healy, and Walter M. Joyce, for plaintiffs in error.

L. J. Nash and W. M. Spooner, for defendant in error.

Before GROSSCUP, BAKER, and SEAMAN, Circuit Judges.

BAKER, Circuit Judge (after stating the facts as above). [1] A contention is presented that the contract is unilateral, unenforceable for want of mutuality, in this: That, while defendant in error covenanted to malt grain for plaintiffs in error, the latter did not agree to deliver grain to be malted. True, they did not so bind themselves in express words; but, taking their express promise to pay monthly for the service and the impossibility of defendant in error's making the agreed monthly deliveries of malt unless the grain was first supplied, undoubtedly the necessary implication respecting the parties' intention is that plaintiffs in error undertook to furnish during the season a minimum of 400,000 bushels of barley to be malted by defendant in error. Compare Hudson Canal Co. v. Penn. Coal Co., 8 Wall. 276, 19 L. Ed. 349; Manistee I. W. Co. v. Lumber Co., 92 Wis. 21, 65 N. W. 863; Excelsior W. Co. v. Messinger, 116 Wis. 549, 93 N. W. 459; W. G. Taylor Co. v. Bannerman, 120 Wis. 189, 97 N. W. 918.

[2] Complaint is made of the rejection of certain evidence which plaintiffs in error claim showed a waiver of their obligation to furnish a minimum of 400,000 bushels and a substitution therefor of whatever quantity they might actually need during the season. But there was no plea of waiver or modification, and so the evidence was properly rejected. Motion for leave to make such a defense was not presented until after judgment. This was too late.

At the close of the evidence, plaintiffs in error moved for a directed verdict in their favor. The evidence relating to the first breach and the alleged rescission was not without conflict, and the questions of fact on these adverse claims were therefore properly submissible to the jury. The assignment on the refusal to direct a verdict presents only the sufficiency of the evidence as to the amount of damages, concerning which objections for incompetency had been interposed.

[3] The expert's tabulation and explanatory testimony, without which there would have been nothing on which a verdict could rest, were based on things done at defendant in error's plant, without the expert's knowledge, during the year ending September 30, 1908.

Two-thirds of the foundation matter was brought into being by defendant in error ex parte and post litem motam. Assuming that the books used in making the tabulation were properly proven and introduced as containing original entries, was evidence of the transactions inadmissible as being self-serving declarations in aid of a pending suit? We have not found a specific answer in any adjudicated case or in any supposititious one propounded by a text-writer. On the analogy of ex parte experiments and tests, however, we deem the matter competent. Here plaintiffs in error engaged to supply barley throughout the year. Their breach deprived defendant in error of part of the gain it would have made during that year. The price being fixed, what better showing of the deprivation of gain could there be than proof of the actual cost per bushel during the year, together with an estimate (based on proven facts) of how much the actual cost would have been reduced if plaintiffs in error had performed their contract? But this matter of cost was not proven by direct evidence. Regular entries in due course of business are admitted as exceptions to the hearsay rule. Wigmore on Ev. c. 51. To bring entries within the exception, there must appear, according to the general law of evidence, a practical necessity for their introduction and a circumstantial guarantee that the transactions actually took place as recorded. The practical necessity is apparent in large mercantile and manufactoring businesses where a transaction that has been participated in by numerous employés in the course of their employment is duly recorded as an original entry in permanent form by one who is charged with that duty in pursuance of an established system. Wigmore, § 1730. But, under the test of trustworthiness, it might be doubted whether the circumstances of this case gave a sufficient warrant of the fairness of defendant in error's manufacturing cost. The parties had had the same relations for six seasons prior to the season in question. Defendant in error presumably knew its showing of cost and profit during those seasons. It sued for $10,000, thereby in effect alleging that it was being deprived of an opportunity to gain about 3 cents a bushel. If the case had been tried when the complaint was filed, defendant in error would have had to rely on its doings while the parties were in amicable relationship. When the case was reached, defendant in error relied entirely upon a calculation which was controlled by transactions with strangers after the parties had had a violent quarrel and were in litigation. This calculation showed more than double the amount demanded, a profit of 100 per cent. on an 8 to 12 days process after deducting every possible expense, including a 5 per cent. return on the investment. The nature of the showing and the circumstances under which it was created might possibly lead to a conclusion that the appearance of a motive to magnify the damages should have been offset by proving a fair correspondence between costs and profits in normal, peaceful seasons and in the season of dispute and warfare, and that, inasmuch as this evidence was in the possession and peculiarly within the knowledge of defendant in error, the showing in question should not have been admitted except in connection with antecedent showings. But

under the Wisconsin statutes we find that there is no ground for holding the evidence inadmissible on this account, and that (the statutory conditions being fulfilled, as they fairly were in this case) the question of untrustworthiness would have to be advanced affirmatively by plaintiffs in error.

· One of the books introduced was the "Steep and Kiln Record." The elevator foreman weighed in and out the barley and malt. Each day he would give or send to the bookkeeper in the office slips of paper purporting to show the weights. From these slips the bookkeeper made the first permanent record. The elevator foreman was present as a witness on another question, but he was not called upon to testify that he had weighed the barley and malt correctly, that he had correctly transcribed the weights upon the slips, and that he had given or sent all the slips to the office. The bookkeeper's testimony that he had accurately entered all the slips he received, and that, so far as he knew they were correct, may be taken as true, and yet the unverified report of the foreman may have been false. Under the test of necessity (Mississippi River Logging Co. v. Robson, 69 Fed. 773, 16 C. C. A. 400, and Gardner v. Wilber, 75 Wis. 601, 44 N. W. 628, decided before section 4189 was adopted), the Kiln Record might not be admissible apart from the testimony of the elevator foreman. But section 4189 does not make the hearsay entry inadmissible even if better evidence, direct evidence, is available and practicable.

From the general books the expert accountant figured in his tabulation, and testified, that the amount expended for coal during the year was $16,336.94. But the question for the jury was how much coal had been consumed in malting the barley, not how much coal had been paid for during the year. There was no record of coal consumed as there was of barley malted. The expert testified, in substance, that he knew that the item "coal paid for" was in fact "coal consumed" because on direction of the company's officers he had consulted with the man in charge of coal and was informed that the amount on hand at the beginning of the year was practically the same as at the end, and that he had satisfied himself that the information was true because he had examined the payments for coal for a period before and after the year in question, and had found nothing that caused him to doubt the coalman's truthfulness. The books and tabulation therefrom being at most only evidence of "coal paid for," the expert's conclusion as to the amount of "coal consumed" rested, not on contemporaneous original entries, but on the unsworn oral statements of others.

Further error appears in the coal item. The expert, assuming that "coal paid for" equaled "coal consumed," deducted certain car loads from the amount shown on the books because he said they were used in drying wheat, not in malting barley. He knew they were so used because the company's men had told him, and because he had examined the invoices of the cars in question, and had found thereon a memorandum "Coal used in drying wheat." When, where, by whom, by what authority the memorandum was written was not shown. But it is urged the error was waived by the cross-examination. Counsel

asked, "Where are those invoices?" Witness answered: "I do not know." Counsel: "We ask that they be produced." Counsel for defendant in error: "If they are not here we can get them; not to-day." We do not find in the record that they ever were produced; and, if they had been, it would have taken some definite action on the part of counsel for plaintiffs in error to have waived the incompetency.

Books containing accounts of money paid to third parties as "general expenses" and otherwise were admitted and made the basis of certain of the expert's calculations. These accounts were admissible, if at all, not under section 4189, but under sections 4186 and 4187. Dohmen v. Blum's Estate, 137 Wis. 560, 119 N. .W. 349. Such book accounts are inadmissible to prove "any item of money delivered at one time exceeding five dollars" or "money paid to third persons." As most of the items exceeded $5 and all of them were payments to third persons, these accounts were inadmissible. The error was waived, it is claimed, because receipts or vouchers were in the court-room and counsel for plaintiffs in error referred to some of them in cross-examining the expert. We do not find in the record any warrant for a claim that receipts for all the inadmissible book items were in court. And counsel referred only to a few of those that were present.

[4] But we do not countenance the contention that an exception to the admission of incompetent evidence is waived because the wronged party endeavors to break its force by cross-examination. So the party would be doubly wronged. We are not required on this record to determine whether or not unsupported receipts or vouchers are of themselves admissible and sufficient proof of payments to third persons.

Among the elements of the calculation was the value of real estate used in defendant in error's malting business. The accountant on hearsay accepted some and rejected other items as they appeared in the "real estate account." A basis for this separation, as to identity of parcels, was afterwards afforded by the testimony of the company's vice president. But he testified that the entries of values were made by the president in January, 1907, and "were comparative valuations with what real estate opposite this plant was being held for." These were therefore not entries of real estate purchases, even if such transactions could be deemed a part of the due course of business in malting barley. They were not contemporaneous records of any act. At most, they were only a record of the opinion of value held by the president in January, 1907.

Without going further, it is evident that the accountant's tabulation and explanatory testimony were so largely based on the incompetent declarations of others that they were inadmissible.

Questions relating to the charge and to the court's action in allowing the amendment of the complaint are not likely to arise on a new trial.

The judgment is reversed, with the direction to grant a new trial, and to permit plaintiffs in error to amend their answer.