POCAHONTAS DISTILLING CO., Inc., v. UNITED STATES.

(Circuit Court of Appeals, Fourth Circuit.  November 5, 1914.)

No. 1258.

1. INTERNAL REVENUE (§ 46*)—DISTILLERIES—ILLEGAL OPERATION.

Evidence *held* to warrant a finding that the running of beer in a distillery into a slop tank, instead of into the mash and fermenting tubs, was not the result of innocent mistake, but was with intent to defraud the United States to the extent of the revenue on the distillate so improperly run into the tank, in violation of Rev. St. §§ 3259, 3263 (Comp. St. 1913, §§ 5995, 6001), and was therefore sufficient to sustain libel against the distillery.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 117–141; Dec. Dig. § 46.*]

2. APPEAL AND ERROR (§ 966*)—CONTINUANCE—DISCRETION.

Denial of a continuance because of the alleged illness of one of defendant's counsel, in the exercise of the trial court's discretion, is not in general ground for reversal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3837; Dec. Dig. § 966.*]

3. APPEAL AND ERROR (§ 977*)—NEW TRIAL (§ 6*)—DISCRETION—REVIEW.

The allowance or refusal of a new trial in a federal court rests in the sound discretion of the trial court, and is not reviewable.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3860–3865; Dec. Dig. § 977;* New Trial, Cent. Dig. §§ 9, 10; Dec. Dig. § 6.*]

4. INTERNAL REVENUE (§ 46*)—LIBEL AGAINST DISTILLERY—PROOF REQUIRED.

On a libel by the United States against a distillery for illegal operation, the government is only required to establish its case by a preponderance of the evidence, and not by proof beyond a reasonable doubt.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 117–141; Dec. Dig. § 46.*]

In Error to the District Court of the United States for the Eastern District of Virginia, at Richmond; Edmund Waddill, Jr., Judge.

Libel by the United States against the Pocahontas Distilling Company, Incorporated.  Judgment for the United States, and defendant brings error.  Affirmed.

Robert H. Talley and John A. Lamb, both of Richmond, Va., for plaintiff in error.

Richard H. Mann, U. S. Atty., of Petersburg, Va., and Hiram M. Smith, Asst. U. S. Atty., of Richmond, Va. (D. Lawrence Groner, of Norfolk, Va., on the brief), for the United States.

Before KNAPP and WOODS, Circuit Judges, and McDOWELL, District Judge.

KNAPP, Circuit Judge.  On July 17, 1913, the United States filed a libel of information against grain distillery No. 2, of the Pocahontas Distilling Company, which is located on the outskirts, but within the corporate limits, of the city of Petersburg, Va.  It appears that this distillery had been under suspicion for some time, and closely watched by certain revenue officers, who, on the 14th of June, discovered that a so-called "slop tank," located outside of and on a line with the second

floor of the distillery building, was full of beer in a state of active fermentation. After measuring the contents of this tank, taking the gravity of the beer, and securing samples, they stationed, a guard at the distillery, which was seized a few days later by the deputy collector. A release bond in the sum of $3,500 was thereupon given by the owners, and an answer filed to the information. At the trial in October following a verdict was rendered in favor of the United States, and from the judgment entered thereon this writ of error is prosecuted.

In section 3259 of the Revised Statutes it is provided that every person engaged in, or intending to be engaged in, the business of a distiller, shall give notice in writing to the collector of the kind of stills to be used and the cubic contents thereof, the number of mash tubs and fermenting tubs, and the cubic contents of each tub. Section 3263 provides, among other things, that every distiller shall cause to be made an accurate plan and description of the distillery and distilling apparatus, distinctly showing the location of every still, boiler, doubler, worm tub, and receiving cistern, the course and construction of all fixed pipes used or to be used in the distillery, together with every place, vessel, tub, or utensil from and to which any such pipe leads, or with which it communicates, and also the number and location and cubic contents of every still, mash tub, and fermenting tub. It seems to be conceded, and certainly is not open to serious question, that on the night of the 14th of June this slop tank was substantially full of beer in a state of active fermentation, that it was unlawful to use this receptacle for such a purpose, and that its use therefor would enable the distillery to produce a larger quantity of spirits than was possible with the appliances legitimately employed for that purpose, and thereby permit a fraud upon the government to the extent of the revenue upon such excess.

[1] The controlling matter in dispute, therefore, related to the circumstances under which this fermenting beer happened to get into the slop tank where it was discovered. If this resulted from an accident or innocent mistake, the owners of the distillery were not chargeable with wrongdoing, and a verdict should have been rendered for the defendant. On the other hand, if this beer was purposely placed in the receptacle where it was found, and where it had no business to be, with the unlawful intention of utilizing the opportunity to defraud the United States, the act was clearly unlawful, the seizure of the distillery was justified, and the verdict and judgment on the bond should stand. This was the vital question of fact for the jury to decide, and that it was distinctly and clearly submitted will appear from the following instructions of the trial court:

"You are further charged that if you believe from the evidence that the slop tank in question was not designed nor used for the purpose of defrauding the government, and that on the occasion when the beer was found therein, as shown by the testimony, that it was pumped there by the defendant's employé accidentally, and without intent or purpose then or thereafter to be used to defraud, you should find for the defendant."

If we correctly apprehend the evidence, it is virtually undisputed that the apparatus used in this distillery was so constructed and arranged that the mash, after it was cooled and ready for fermenting, could be

pumped directly from the cooling tank into this outside slop tank. But this would be manifestly improper, as seems to be conceded, because the slop tank could not be lawfully used for fermenting purposes, and the only proper course for the beer to take from the cooling tank would be into the fermenting tubs located on the inside of the distillery. The plaintiff in error asserts that the object of this arrangement of pipes was to allow the slops or swill to flow down from the slop tank into the cooler for the purpose of producing fermentation without the use of yeast; but the government contends that this was a mere pretense, and that the real object and purpose of the arrangement was to permit the unlawful use of this outside tank as an additional fermenter, and to thereby secretly produce considerable quantities of spirits which would escape revenue taxation.

The plaintiff in error's theory of accident or mistake finds its sole support in the testimony of its employé, a colored man by the name of Whittaker, to the effect that on Thursday, two days before the discovery of the beer in the outside tank, he had started to pump the beer for that day's run from the cooler into the fermenters; that after the beer had begun to run he discovered that the valves to the fermenters were closed and the valves to the slop tank open; that he thereupon opened the valves to the fermenters and closed the valves to the slop tank, while the rotary pump was still running; that the effect of this was to allow a part of the mash intended for the fermenters to remain in the slop tank; and that afterwards, instead of opening the valves to the slop tank, so that the beer which had been accidentally pumped into that receptacle might run back again into the fermenters, he kept the valves of the slop tank closed and filled up the fermenters with water. It appears, however, that the mash could not be pumped from the cooling tank into the outside tank unless all the valves in the pipes leading to the outside tank were open and all the valves in the pipes leading to the fermenters were closed. This, of course, would be the case, because the outside tank was at a higher elevation than the fermenters, and the beer which was pumped up would therefore go into the fermenting tubs rather than to the upper outside tank. It is also the case that after the beer had been pumped into the slop tank it would not have remained there, unless the valves in the pipe leading to this tank had been kept closed. The testimony of this witness, consequently, involves the statement that the valves to the fermenters were closed when they should have been open; that the valves to the slop tank were open when they should have been closed; that he opened the valves to the fermenters and closed the valves to the slop tank when the pump was in full operation, without assistance, without informing any one of what he was doing, and without being observed by any of the various persons, including the revenue officers, who were then in the distillery; that subsequently he supplied the loss of more than one-fourth of the day's run by adding water to the unfilled fermenters, when by simply opening the valves to the slop tank he could have refilled the fermenters with beer; and that this condition, notwithstanding constant opportunity to correct it, continued unchanged for something like 60 hours.

The record discloses no corroboration whatever of the testimony of

this employé, and the jury evidently regarded it as so improbable as to be wholly unworthy of belief. It was an attempted explanation of the presence of beer in the slop tank, which the jury rejected, because in their estimation it could not have been truthful. The presence of this large quantity of fermenting beer in the slop tank, which was prima facie unlawful, the existence of a pipe, whether properly shown on the plan of the building or otherwise, leading to the fermenting tubs below, the fact that the apparatus could be so manipulated as to readily turn the slop tank into a fermenting tub, with the consequent opportunity to distill spirits which evaded taxation, were sufficient evidence, in our judgment, to permit the inference of fraudulent intent, and to justify a finding in favor of the government, in the absence of satisfactory proof that the apparent misconduct resulted from an innocent mistake. In short, we are satisfied that there was sufficient evidence of intention and attempt to defraud to warrant the submission to the jury of the question of fact, and it is the misfortune of plaintiff in error that the jury before whom the witnesses testified, and who had every opportunity to judge of their veracity, refused to accept the explanation which the defendant set up, because they believed that the fact was otherwise.

This conclusion disposes of the contention that a verdict should have been directed for the defendant, because there was no evidence of intent to defraud the government, and it remains to consider the other assignments of error, so far as they seem to require discussion.

[2] Of the refusal of the trial court to grant a continuance of the case because of the illness of one of defendant's counsel, it is sufficient to say that we have carefully considered the evidence relating to this assignment and are satisfied that there was no abuse of judicial discretion. This is made evident by the undisputed facts appearing in the certificate of the trial judge, and we are unable to find in these facts and the connecting circumstances any basis for an exception to the general rule that a motion for continuance is addressed to the discretion of the trial court, and that its denial constitutes ordinarily no ground for the reversal of a judgment.

[3] The same may be said of the refusal to set aside the verdict for alleged misconduct of one or more of the trial jurors. Upon the affidavit of defendant's president, which was filed after the verdict and before entry of judgment, and which alleged facts on information and belief, there was an examination before the court of three of the jurors, seven others being present, and a full investigation of the episode referred to in the affidavit. In the light of the facts and circumstances as they were then developed, it is certainly difficult to see that anything had occurred which tended to influence the jury against the plaintiff in error, or operated in any way to its prejudice. Even if we were inclined to a different opinion, it would be of no avail on this appeal, as the federal rule is well settled that the allowance or refusal of a new trial rests in the sound discretion of the trial court, whose action in that regard cannot be made the subject of review. Prichard v. Budd, 76 Fed. 710, 716, 22 C. C. A. 504; City of Newport News v. Potter, 122 Fed. 321, 333, 58 C. C. A. 483; Holmgren v. United States, 217 U. S. 509, 521, 30 Sup. Ct. 588, 54 L. Ed. 861, 19 Ann. Cas. 778.

218 F.—50

[4] The court instructed the jury in substance that the government was not required to establish its case beyond a reasonable doubt, but that a preponderance of proof would be sufficient to sustain a verdict. If this proposition has been at any time in doubt, its correctness is now settled by the recent decision of the Supreme Court in United States v. Regan, 232 U. S. 37, 34 Sup. Ct. 213, 58 L. Ed. 494.

We have carefully examined the remaining assignments, which relate for the most part to rulings upon questions of evidence, without finding any error which requires a reversal of the judgment or furnishes occasion for special comment.

In our opinion, the case was properly and fairly submitted to the jury, and the judgment upon their verdict should therefore be affirmed.