ROSS ENGINEERING CO. et al.
v. PACE et al.

SAME v. PETER MITCHELL, Inc. et al.

SAME v. PACE et al.

Nos. 5414–5416.

Circuit Court of Appeals, Fourth Circuit.
Jan. 8, 1946.

Louis Rosenberg, of New York City (Bernard J. Gallagher, of Washington, D. C., and Lester S. Parsons, of Norfolk, Va., on the brief), for appellant Ross Engineering Co.

Robert B. Tunstall, of Norfolk, Va., for appellant Fidelity & Casualty Company of New York.

Andrew Eckel, of New York City, for appellants Peter Mitchell, Inc., Paul Bacco & Son, Inc., and D. T. Small Contractors, Inc.

W. R. Ashburn, of Norfolk, Va. (Maurice B. Shapero, of Norfolk, Va., on the brief), for Gordon B. Pace and others.

Before SOPER and DOBIE, Circuit Judges, and HARRY E. WATKINS, District Judge.

SOPER, Circuit Judge.

These cases, which were consolidated for trial in the District Court, relate to controversies between certain corporations which participated in the erection of the Armed Guard School at Camp Bradford, Virginia. Ross Engineering Company, hereinafter called Ross, was the general

contractor under a construction contract with the Navy Department of the United States under date of May 14, 1943. Peter Mitchell, Inc., Paul Bacco & Son, Inc. and D. T. Small Contractors, Inc., hereinafter collectively called M.B.S., were associated as subcontractors in the performance of a certain part of the work under a written contract with Ross dated June 8, 1943; and Gordon B. Pace, Fred A. Haycox and Asphalt Roads and Materials Company, Inc., hereinafter collectively called A.R.M., entered into two written contracts under date of May 13, 1943 with M.B.S. and performed certain portions of the work which M. B.S. had contracted to do for Ross. The Fidelity and Casualty Company of New York was the surety upon the performance and payment bonds given by Ross for the protection of persons supplying labor and materials in the prosecution of the work in accordance with the provisions of the Miller Act, 40 U.S.C.A. § 270(a) (1) and (2).

Originally there were four cases, No. 5414, a personal action by A.R.M. against M.B.S.; No. 5416, a personal action by A.R.M. against Ross; No. 5415, a suit under the Miller Act by the United States suing for M.B.S. against Ross, the Surety and A.R.M; and a fourth suit under the Miller Act by the United States suing for Phil H. McGuire against the Surety. By appropriate pleadings and interventions and the order of the court consolidating the cases, they became suits under the Miller Act.

### Case No. 5414.

This case originated as an action at law by A.R.M. against M.B.S. to recover the sum of $76,324.90 which represented the balance claimed to be due for services in the aggregate sum of $167,840.70, less $91,-515.80 paid on account. Ross and the Surety Company intervened on the ground that they would be liable for any judgment which might be obtained in the suit against M.B.S.; and at their instance, the case was consolidated with cases Nos. 5415 and 5416 which will be hereafter considered; and thereupon the action became a suit under the Miller Act. The issues in case No. 5414, now under consideration, arose primarily between A.R.M. and M.B.S. and the liability of Ross and the Surety Com-

pany is dependent upon the liability of M. B.S.

The site of the work comprises 119.3 acres of land adjacent to Camp Bradford in Princess Anne County, Virginia. It was overgrown with trees and underbrush. The prime contract called for the performance of the following projects:

(1) The clearing and grubbing of the site by the removal of trees, stumps, roots and underbrush and the grading incident thereto.

(2) The installation of storm sewers and drainage to remove surface water and lower the water level in the soil.

(3) The construction of roads and streets at designated locations.

(4) The construction of buildings, including barracks, mess halls, assembly halls, store houses and fire stations.

(5) The installation of underground utilities, such as water lines, sanitary sewers, electric lines and conduits, and telephone and power poles to serve the buildings.

Ross undertook these projects for the lump sum price of $2,837,237 and agreed to complete the entire work in one hundred days under a penalty of $800 per day for delay. In order to facilitate the performance of the contract Ross promptly sublet Items 1, 2, 3 and 5 above named to M.B.S. for the lump sum of $395,000. M.B.S. in turn entered into two contracts with A.R.M., one for Item 1, the clearing and grubbing work at the unit price of $300 per acre for 60 acres, and the other for part of Item 3, namely, the laying of the stone base course of the roadways at $1.55 per square yard.[1]

The transactions under the contract between A.R.M. and M.B.S. gave rise to three claims on the part of A.R.M. which constitute the basis of the case now under consideration, as follows: (a) A claim that after A.R.M. had cleared and grubbed 60 acres of land, the acreage named in the contract, A.R.M. and M.B.S. entered into an oral contract for the clearing and grubbing of 32 additional acres on the basis of cost plus ten per cent; and that A.R.M. cleared and grubbed the additional acreage at the approximate cost of $850 per acre, aggregating $27,200; (b) a claim that in laying the stone base for the roadways

---

[1] M.B.S. entered into a separate contract with McGuire for laying the asphalt top of the roadways. McGuire brought suit against the surety under the Miller Act, but this case after consolidation with the others was settled in the course of the trial in the District Court.

A.R.M. encountered unsuitable material below the sub-grade, as shown on the plans of the roads, for which contingency the contract provided that M.B.S. would compensate A.R.M. at a price to be agreed upon or at cost plus ten per cent; that A.R.M. was obliged to make a fill of 12,388 cubic yards of sand-clay, and since no agreement between the parties as to the price was reached, A.R.M. became entitled to the sum of $21,173.48; (c) a claim that during the course of the work A.R.M. allowed M.B.S. to use certain of its equipment and performed other services incidental to the work for which M.B.S. agreed to pay the sum of $8,467.22.

These three items, plus the undisputed items of $18,000 for clearing and grubbing 60 acres of land, and $93,000 for laying 60,000 square yards of stone-base, aggregated a total of $167,840.70, upon which it was acknowledged that $91,515.80 had been paid, leaving a balance of $76,324.90. M.B.S. claimed an offset in the sum of $38,593.23 for back charges incurred by A.R.M. in the course of the performance of its contract. The case was tried before a court and jury and resulted in a verdict for A.R.M. in the sum of $46,024.90.

The attack of the appellants is centered upon the item of $27,200 for clearing and grubbing 32 additional acres and $21,173.48 for laying the sand-clay sub-base, and it is pointed out that the aggregate of these items, namely, $48,373.48, exceeds the amount of the verdict, so that if there was no liability for any part of these items, the entire verdict of the jury should be wiped out and the judgment of the court should be reversed. Appropriate motions for a directed verdict in favor of the defendants M.B.S. in respect to these claims were made in the District Court and the denial of the motions is the basis of the appeal.

### Claim of $27,200 for Clearing and Grubbing 32 Additional Acres.

Haste in the execution of the prime contract was imperative and accordingly negotiations between the interested parties took place. Some of the work was done before any of the contracts were actually signed. The contracts between A.R.M. and M.B.S. were dated May 13, 1943 but were not executed until a week or so later. On May 12, 1943 M.B.S. was authorized by letter from Ross to proceed with the work pending the execution of the formal contract between them; and M.B.S. in turn authorized A.R.M. to proceed with the clearing and paving work before the contracts between them were executed; and A.R.M. commenced the clearing and grubbing about May 15. The parties to this contract believed that the area to be cleared comprised approximately 60 acres. The written contract between them so described it and provided that A.R.M. "clear and grub the land * * * in accordance with the plans and specifications as set forth in the Government contract with the contractor * * *" at the rate of $300 per acre.

The evidence on behalf of A.R.M. as to the subsequent events which led to its claim for compensation for clearing additional acreage may be summarized as follows:. A.R.M. proceeded with the work and gathered the debris in large piles to be burned, believing that it could be disposed of in this way; but the specifications annexed to the prime contract provided that the debris had to be removed and disposed of outside the limits of the site. While the specifications were available to A.R.M. it did not examine them and based its bid on the estimated cost of burning the material on the site so that it need not be hauled away. When it was ascertained that this could not be done under the Government contract, both M.B.S. and A.R.M. endeavored unsuccessfully to secure a modification of the specifications. At this time between 5 and 10 acres had been cleared. A.R.M. proceeded with the work in the manner required by the specifications and cleared 60 acres and charged for them at the contract rate of $300 per acre. The cost of the work greatly exceeded this sum; and when it was found that additional acreage had to be cleared, A.R.M. refused to do the work. Thereupon A.R.M. and M.B.S. entered into a supplemental oral agreement which provided that A.R.M. should clear the additional acreage, which proved to be 32 acres, at cost plus ten per cent. The cost of clearing the entire 92 acres was $77,863.08 or $846.34 per acre. For the additional 32 acres A.R.M. confined its charge to $850 per acre or, $27,200.

The execution of the oral agreement was not supported by any writing but was provided by the testimony of officials of A.R.M. They said that it was made in the

middle of June, 1943 when the original 60 acres had been cleared. Testimony of opposing witnesses indicated that 60 acres were not completely cleared and grubbed before August 15, 1943.

The defendants contend that the judge should have directed a verdict in their favor upon this claim because the evidence offered on behalf of A.R.M. was incredible in view of the admitted circumstances and opposing testimony summarized as follows: A.R.M. was composed of experienced contractors familiar with the kind of work they agreed to perform. They examined the specifications which provided that within the limits of construction the ground should be cleared of *all* trees, stumps, woods, brush and rubbish, and that the material cleared away should be removed from the reservation and disposed of by the contractor. Therefore A.R.M. could not have been surprised either as to the extent or probable cost of the work. On the contrary, they agreed to do the work for a low price because they believed they could get permission from the Government to burn the rubbish on the site.

In the latter part of June and in July, after the first 60 acres had been cleared and the new supplemental contract had been made according to the testimony of A.R.M., it presented bills at the old rate of $300 per acre showing that less than 60 acres had been cleared. In fact A.R.M. did not complete 60 acres of clearing as late as the latter part of August; and in late July A.R.M. accepted $25,000 from M.B.S., not as payment for past services but as a loan on the ground that it had been working at a loss and needed the money to enable it to continue. A.R.M. did not produce any writing which referred to the oral contract and the testimony of its witnesses as to the contents of the contract was conflicting. Finally the testimony of the Government official as to the extent of the acreage cleared showed that on 22.28 acres only light clearing was needed, which could be done at a cost of $100 per acre.

It is obvious from these summaries of the testimony on both sides that there were weaknesses in the claim of A.R.M. in respect to this item; but it is equally clear that there was substantial evidence in support of the claim and that the judge had no alternative but to submit the controversy to the jury.

## Claim of $21,173.48 for Laying Sand-Clay Sub-Base.

This claim grows out of the circumstances which arose during the performance of the second written contract between M.B.S. and A.R.M. dated May 13, 1943, wherein A.R.M. agreed to grade and construct a stone-base course for the roads at the rate of $1.55 per square yard and "in accordance with the plans and specifications as set forth in the Government contract with the contractor." The contract between A.R.M. and M.B.S. also contained the following special provision: "In the event that any unsuitable material is encountered below the sub-grade, as shown on the plans, the contractor agrees to compensate the subcontractor at a price to be agreed upon or at the subcontractor's costs plus ten per cent." The claim of A.R.M. now under consideration is based upon evidence which tends to show that such unsuitable material was encountered which made it necessary to lay the sand-clay base; and since there was no new agreement as to the price to be paid for the extra work, it was charged at cost plus ten per cent. The defense rests largely on the interpretation to be given to the clause just quoted from the contract; and it is therefore pertinent to state the conditions under which the clause was inserted. Restatement, Contracts, Vol. 1, § 235(d); Williston, Contracts, Rev. Ed., §§ 618, 629. The evidence offered on behalf of A.R.M. in this respect may be summarized as follows:

Officials of A.R.M. had worked at Camp Bradford before and, by reason of their familiarity with the soil, were apprehensive that it would be necessary to install additional material as a sub-base for the stone foundation of the roads. The price of $1.55 for the stone base was nevertheless fixed on the assumption that additional material would not be required, and the contingency feared was taken care of by the provision of the contract above set out. Soon after the work began it was found that additional material was needed to give the stone base a firm foundation. The matter was taken up with M.B.S. and Ross and it was agreed by all of the parties that an application for extra compensation should be made to the contracting officer of the Government in charge. This official ruled that the placing of the sand-clay fill was not required and thereupon Ross refused any additional compensation to M.B.S. which

in turn refused additional compensation to A.R.M. It was necessary, nevertheless, to secure the sand-clay fill in order that the work should comply with the government specifications; and the sand-clay base was laid in the amount and at the cost specified in the claim.

The defense to the claim is based primarily on the ground that all of the contractors and subcontractors on the work who were responsible for the installation of the stone base were bound by the decision of the contracting officer, and therefore none of them were entitled to additional compensation for the cost of the work. The specifications annexed to the main contract provided in substance that the sub-grades for the roads should be shaped to a true surface conforming to the plans, and material in soft spots should be removed and replaced with suitable materials as directed, so that before placing the stone, the sub-grade should be free from depressions or soft spots. The contract itself provided that if the contractor should encounter sub-surface or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, the attention of the contracting officer should be called thereto who should promptly investigate the same and if he should find a material difference, the contract should be modified to provide for an increase or decrease of costs resulting from such conditions. The contract also provided that all disputes concerning questions of fact arising under the contract should be decided by the contracting officer and his decision should be final and conclusive.

Our attention is called to the established rule that contract provisions of this kind are binding upon the parties;[2] and the contention is made that the provision in the contract between M.B.S. and A.R.M. with respect to encountering unsuitable material is so similar to the corresponding provision in the main contract that they should receive the same interpretation. We do not agree with this conclusion; for in effect it requires us to construe the contract between M.B.S. and A.-R.M. as if the provision thereof under consideration was omitted therefrom in its entirety. This cannot be done because the evidence on behalf of A.R.M. indicates that the provision was inserted to take care of the very contingency that occurred; and we can give effect to it without doing violence to the promise of A.R.M. to lay the stone base in accordance with the government's plans and specifications. That promise may fairly be taken to apply to the character of the work described in the specifications without binding A.R.M. to accept the ruling which the contracting officer was empowered to make, not by the specifications but by the contract itself. We recognize the force of the general rule that agreements to abide by the decision of a contracting officer are binding; but we hold that under the present circumstances it was the intention of M.B.S. and A.R.M., with respect to the compensation to be paid for laying the stone base in the event that unsuitable material should be encountered, that the actual conditions rather than the judgment of the contracting officer of the United States should govern. This arrangement in no way interfered with the interests of the United States or of the right of the contracting officer to pass on the sufficiency of the performance. In this instance the plaintiff's evidence showed that unsuitable material was found without fault on its part and that the sand-clay sub-base as well as the stone base was actually laid and accepted by the United States. For these reasons the judge would not have been justified in withdrawing this claim from the consideration of the jury.

### Counterclaim of M.B.S. Against A.R.M. for $38,593.23.

Little need be said on this subject since it raises only questions of fact which were submitted to the jury. A.R.M. claimed a balance due of $76,324.90 and was allowed $46,024.90 by the jury. The difference may represent a reduction in the amount claim-

2 Ogden v. United States, 5 Cir., 60 F. 725; Robinson v. United States, 2 Cir., 251 F. 461; General Contracting Corporation v. United States, 4 Cir., 70 F.2d 83; United States ex rel. Johnson v. Morley Construction Co., 2 Cir., 98 F.2d 781; Anderson v. United States, 9 Cir., 123 F.2d 13; Welsbach Eng. & Management Corporation v. Commissioner, 3 Cir., 140 F.2d 584, certiorari denied 322 U.S. 751, 64 S.Ct. 1261, 88 L.Ed. 1581; Plumley v. United States, 226 U.S. 545, 33 S.Ct. 139, 57 L.Ed. 342; United States v. Callahan Walker Construction Co., 317 U.S. 56, 63 S.Ct. 113, 87 L.Ed. 49; United States v. Blair, 321 U.S. 730, 64 S.Ct. 820, 88 L.Ed. 1039.

ed by A.R.M. or an allowance of items in the counterclaim, or both. No errors of law in regard to the counterclaim were alleged by M.B.S., the party primarily liable on the claim of A.R.M.

Certain objections to the rulings of the court on the admissibility of evidence have been presented but we find upon examination no prejudicial error and nothing worthy of comment.

### Claim of M.B.S. for Judgment Over Against Ross.

At the trial of the consolidated case below M.B.S. asked the court to charge the jury in effect that if it should find a verdict in favor of A.R.M. against M.B.S. on the clearing and sand-base claims, it should increase by a corresponding amount the verdict which M.B.S. was seeking against Ross in case No. 5415; and when the verdict adverse to M.B.S. was rendered in case No. 5414, it asked the court to instruct the jury to break down the verdict so as to show what amounts were awarded on each of the two claims in suit. Both motions were refused.

This view of the liability of Ross to M.B.S., so far as the clearing claim is concerned, is based on circumstances which prevailed at the beginning of the operations under the main contract, when the clearing of the land was the first step to be taken and prompt action was imperative. At that time negotiations between Ross and M.B.S. took place, which culminated in the bid of $395,000 by M.B.S. on May 12, 1943 to do the work assigned to it, and thereupon Ross wrote to M.B.S. and gave it authority to proceed at once in strict compliance with the Government plans and specifications for the construction of the camp pending receipt of the formal contract which would supersede the notice to proceed. This letter expressed the understanding and agreement that for the sum of $395,000 M.B.S. was to furnish all labor, materials and equipment to complete all earthwork, clearing and grubbing, &c., underground services, paving and walks as specifically included in specification section numbers 2, 3 and U-1, which comprehended items 1, 2, 3 and 5 described in general terms at the beginning of this opinion. During these negotiations Ross understood and stated that approximately 60 acres were to be cleared but both parties examined the government specifications prior to the writing of the letter of May 12, 1943, and both had access to the site of the work.

The formal contract which followed contained in substance the same description of the work to be done as the letter and expressly provided that the work was to be done according to government specifications. In respect to this work M.B.S. agreed to assume all the obligations imposed by the specifications and the general conditions of the Government contract upon Ross. The formal contract was dated June 8, 1943, but was not executed by both parties prior to June 24, 1943. In the meantime Ross had referred M.B.S. to A.R.M. in order to facilitate the work and they had entered into the contracts between them above described in which the area to be cleared was specifically stated to be approximately 60 acres. All of this acreage, according to the testimony of A.R.M., was cleared by the middle of June.

M.B.S. contends that under these circumstances there arose not only its formal written contract with Ross, but also an earlier oral contract distinct and separate therefrom wherein the extent of the area to be cleared was agreed to be 60 acres, and that M.B.S. relied and acted upon this contract when it made its contract with A.R.M. By this course of reasoning M.B.S. seeks to read into the formal written contract with Ross a limitation of 60 acres and to recoup from Ross the loss it sustained by specifying the same acreage in its contract with A.R.M.

We cannot follow this line of argument for it is clear that there was no wilful representation on the part of Ross and equally clear that M.B.S. made its own examination of the subject matter with access to the same sources of information as Ross and that both parties agreed to clear the site of all timber and undergrowth thereon in conformity with the specifications for a lump sum price. Even in the letter of May 12, to which M.B.S. agreed by proceeding with the work, the area to be cleared was not limited to 60 acres; and if such a limitation be now read into the transaction there would be a breach of the express provision of the formal contract that it alone should be binding on the parties and should have precedence over all written or verbal acceptances or proposals. Moreover, it would be a violation of the established rule that any agreement made or opinion expressed in previous parol negotiations as to the terms or legal effect of a subsequent written agreement does not prevail over the provisions thereof in the

absence of some artifice or fraud. New York Life Ins. Co. v. McMaster, 8 Cir., 87 F. 63, 71; St. Paul Fire & Marine Ins. Co. v. Balfour, 9 Cir., 168 F. 212; G. L. Webster Co. v. Trinidad Bean & Elevator Co., 4 Cir., 92 F.2d 177; United States v. Bethlehem Steel Co., 205 U.S. 105, 27 S. Ct. 450, 51 L.Ed. 731; Restatement, Contracts, Vol. 1, § 237.

■■ We find no support for the position of M.B.S. in the provisions of the Miller Act which makes the prime contractor and its surety liable to all persons supplying labor and material in the prosecution of the work, even though they act under a direct contractual relationship with a subcontractor and have no contractual relationship with the prime contractor. The effect of the statute in this case was to create a liability on the part of Ross to pay A.R.M. for labor and material furnished by it; but the statute did not relieve M.B.S. of its liability to A.R.M., or discharge M.B.S. from its obligation to Ross to do the work described in the subcontract between them for the agreed price. The Act did not impose upon Ross the liability to pay M.B.S., not only the price named in the subcontract, but also for such expenditures as it should make in the performance of the subcontract. That instrument expressly provided that if there should be evidence of any claim chargeable to M.B.S. for which Ross might become liable, then Ross should have the right to retain out of any payment due M.B.S. an amount sufficient to indemnify itself from loss, and that if no such claim should be presented until after all payments had been made, then M.B.S. would refund to Ross all monies that it might be chargeable with in connection with the work. This provision of the subcontract was not in conflict with the statute.

■ It is also quite clear that M.B.S. has no claim over against Ross on account of the sand-clay base claim of A.R.M. The previous discussion of that matter in this opinion makes it clear that the claim was based on the special contract between A.R.M. and M.B.S. to which Ross was not a party. It follows, for the reasons given, that although both Ross and the Surety have a liability on this claim to A.R.M. under the statute, they have no liability to recompense M.B.S. for any expenditures that it may have made under its contract with A.R.M.

The judgment in case No. 5414 will be Affirmed.

## No. 5416.

This suit was originally brought in the District Court by A.R.M. against Ross to recover $9,620.77 for work done and materials furnished in connection with the prime contract, and $34,400 for the cost of rebuilding and rescarifying certain portions of the stone base of the roads which were damaged by premature use in the construction of the camp. Jurisdiction of the matter was originally based on diversity of citizenship but the suit has proceeded as a suit under the Miller Act since it was consolidated with the other suits, Nos. 5414 and 5415, now under consideration.

■ During the period between May 13 and September 2, 1943, when A.R.M. was engaged in the performance of the contracts with M.B.S. heretofore described in case No. 5415, it entered into direct contractual relations with Ross by leasing to it certain equipment and furnishing it with materials and services that were used in the construction of the camp. For these items A.R.M. charged Ross the sum of $9,-620.77 which items were disputed and became in part the basis of this suit. Ross concedes that the dispute as to items thereof aggregating the sum of $5,801 presented merely jury questions and need not be considered on this appeal. Our examination of the record convinces us that the same may be said with regard to the rest of the items. They included an item of $610.05 said to have been incurred by and properly charged against M.B.S., an item of $2,676 for loading sand-clay for Ross, and a charge of $2,927.90 for the use by Ross for dumping purposes of a plot of land which A.R.M. had secured the right to use from the owner and had agreed to clear up after the work was finished. There was evidence to support the submission of each of these items to the jury and it was for the jury to decide what allowance, if any, should be made thereon. The amount sued for on these items and on the road matter aggregated $44,020.77 and the verdict was for $30,400. There was no error in submitting the items included in the sum of $9,620.77 to the jury.

The second part of A.R.M.'s cause of action is for the sum of $34,400 for the cost of reconstructing 26,000 square yards of the stone-base course and rescarifying 14,000 square yards thereof in order to bring the work up to the standard required by its contract with M.B.S. described in

Case No. 5415. According to the evidence of A.R.M. this work of reconstruction was necessary in order to repair the damage caused by the premature use of the roads which Ross permitted and encouraged in order that the entire Government project for which it was responsible might be finished in the time limit of one hundred days. Ross pressed the subcontractors for the utmost speed on their part and without awaiting for the completion of their share of the work, began at once the construction of the buildings, the greater part of the project, which it had reserved for itself. In the rush of the construction the workmen of Ross, M.B.S. and other contractors on the site and the material men who delivered supplies to the contractors drove heavy trucks, bulldozers and other vehicles over the stone-base soon after it was laid. Workmen's cars were parked along the sides of the new roads so that the passage way for vehicles was at times very narrow. In addition, Ross filled the ditches parallel to the roadways with logs at various points so that the vehicles could cross from the roadways to the building sites, with the result that water was impounded and soaked back into the base. It was testified that so great was the haste of the contractors in their efforts to meet the time limit that sometimes traffic was let upon the roads within an hour after the stone-base had been laid, and that in consequence the heavy vehicles sank into the surface of the base and caused rocks and part of the base to be thrown to the side and into the gutters.

A.R.M. protested to M.B.S. and was referred to Ross which made some attempt to protect the work by constructing barricades and stationing flagmen and watchmen at the entrance to prevent parking along the newly constructed roads. In addition a $5,000 parking lot was built. However, after two days Ross discontinued these efforts as it considered that it was more important to finish the buildings than to worry about the roads.

A.R.M. alleged in its complaint that Ross had agreed that to the extent which the roads under construction were damaged by immediate use Ross would pay for the additional work which A.R.M. was required to do in order to restore them. There was, however, no evidence of such an express agreement on the part of Ross. Accordingly, Ross moved the court at the conclusion of the evidence to instruct the jury to find a verdict in its favor on this item of the claim. It also prayed the court to instruct the jury that A.R.M. was bound to prove that Ross had promised to pay the cost of rebuilding and rescarifying the roads as alleged, and that A.R.M. could not recover on any theory of implied contract or any theory of negligent wrongdoing. The judge refused these requests. He instructed the jury that although A.R.M. had no written contract with Ross, it contended that it requested Ross to keep the traffic off the new roads and was told by Ross to go ahead and rebuild the roads and that settlement would be made on the completion of the work; and hence A.R.M. contended that it reconstructed the roads under an express or implied contract. On behalf of Ross the judge instructed the jury that Ross denied having made any agreement express or implied for the cost of reconstructing the roads and contended that the damage was due to the failure of A.R.M. to build the roads properly in conformity with the specifications and also to the failure of M.B.S. to drain the area properly in conformity with its subcontract, and that if these delinquencies had not occurred the movement of the traffic on the roads would have improved rather than injured them.

The judge warned the jury that it was for them to determine what testimony had been given; and that in passing on the claim for damage to the roads they should first consider whether the damage was caused by the equipment of Ross or of others for whom Ross was responsible; and that the jury should also consider whether there was any agreement by Ross to reimburse A.R.M. for the damage to the roads, and if they found that the damage was caused by Ross or those for whom it was responsible, or that Ross instructed A.R.M. to rebuild the roads at the expense of Ross, they should determine the reasonable expense thereof; but, on the other hand, if they should determine that the damage was done to the roads without fault of Ross, then their verdict should be for the defendant on that item of the claim. Ross excepted to the adverse rulings of the court and made the point that there was no evidence to support the statement of the judge that A.R.M. contended that Ross had instructed A.R.M. to reconstruct the roads at its expense.

It appears from this review that the statement in the judge's charge, that

A.R.M. contended that it had an oral agreement with Ross as to the roads, should have been omitted; but we do not think that this error was prejudicial to Ross in the view we take of the legal principles which govern the case. The judge left it to the jury to determine whether in fact there was such an express agreement and stated fully the opposing contention of Ross denying the existence of the agreement and attributing the damage to the delinquency of the contractors; and finally the judge clearly told the jury to find their verdict on this point for Ross if they should conclude that the damage was done without fault of Ross.

The jury's verdict for $30,400 was necessarily based upon the finding that the damage to the roads was caused by Ross or by persons within its control; and upon this hypothesis, we think that the liability of Ross to A.R.M. is established, whether the case be considered an action at common law or a suit under the Miller Act. Ross was the general contractor in control of the entire project. It had the undoubted right to regulate the work and to forbid not only its own employees but also the employees of subcontractors and delivery men from interfering with the construction of the camp. Actually Ross exerted this authority for a short period and then abandoned the effort in the interest of speed. It could have arranged the work allotted to others and the work reserved for itself so that the various activities would not interfere with one another, but inspired by the fear of penalties for delay, it started various parts of the work simultaneously and pressed the subcontractors to complete their respective commitments as rapidly as possible. The result was that the roads had to be reconstructed in order to conform to specifications and to entitle Ross to compensation under its contract with the United States.

It follows that a promise to pay for the benefits conferred should be implied. The situation is akin to that which occurs when one accepts goods or services from another who expects payment for them. It is urged upon us that no intention to pay for the roads can be attributed to Ross in this case in the face of its vigorous denial of all liability. See Baltimore & O. R. v. United States, 261 U.S. 592, 43 S.Ct. 425, 67 L.Ed. 816. But this attitude rests on the contention that the damage was caused by faulty work and since this view is no longer tenable in the light of the jury's verdict, the defendant is forced into the field of quasi contracts where the rule is that, irrespective of the intent of the party to be charged, liability arises when one is enriched and receives a benefit at another's expense for which equitably he ought to pay. It has been held in a variety of circumstances that when such a situation occurs, a contract to pay is implied in law.

In Williston on Contracts, Revised Edition, Vol. 1, it is said:

"§ 36. Offers implied in fact; contracts for services.

"An offer need not be stated in words. Any conduct from which a reasonable person in the offeree's position would be justified in inferring a promise in return for a requested act or a requested promise by the offeree amounts to an offer. The common illustration of this principle is where performance of work or services is requested. If the request is for performance as a favor, no offer to contract is made, and performance of the work or services will not create a contract; but if the request is made under such circumstances that a reasonable person would infer an intent to pay for them (and this is always a question of fact under all the circumstances of the case) the request amounts to an offer, and a contract is created by the performance of the work. And even though no request is made for the performance of work or service, if it is known that it is being rendered with the expectation of pay, the person benefited is liable. It is a question of fact if services are accepted whether a reasonable man in the position of the parties would understand that they are offered in return for a fair compensation, or would rather suppose either that they are offered gratuitously, or if not, that the recipient might think so. * * * *"

"§ 36A. Other offers implied in fact.

"* * * The contracts implied in fact arising from offers of the sort mentioned in this section are closely connected in the history of the law with quasi contracts. Indeed, quasi contracts have largely grown up under the fiction of an implied request which enabled the courts to give the same remedy of indebitatus assumpsit to a plaintiff who had furnished a benefit to the defendant which the latter ought equitably to pay for, as was given to plaintiffs who had entered into a real though not express con-

tract by furnishing consideration at the request of the defendant. But the procedural similarity should not obscure the distinction between the two. The courts, however, safeguard parties from having contracts thrust upon them, and in consequence, a benefit conferred by a volunteer will rarely justify a promise implied in fact."

"§ 3. Express and implied contracts; quasi contracts. * * *.

"It is important to distinguish between quasi contracts and contracts implied in fact, not only because it is desirable for clear theoretical analysis, but also because of the difference in the legal relations which may be involved under a true contract and those imposed by law under the name of a quasi contract. In the first place as quasi contractual obligations are imposed by the law for the purpose of bringing about justice without reference to the intention of the parties, the only apparent restriction upon the power of the law to create such obligations is that they must be of such a sort as would have been appropriately enforced under common-law procedure by a contractual action. * * *".

See also § 91D; G. T. Fogle & Co. v. United States, 4 Cir., 135 F.2d 117, 120; Restatement, Contracts, § 5.

▮ In the instant case these general principles find support in the positive provisions of the Miller Act, 40 U.S.C.A. §§ 270a and 270b which provide that every person who has furnished labor or materials in the prosecution of a Government contract, for which a payment bond must be furnished, and has not been paid in full, shall have the right to sue on the payment bond and to prosecute the action to final execution and judgment for the sum justly due him. This Act, like its predecessor the Heard Act, 40 U.S.C.A. §§ 270, 270a note, has been consistently given a liberal interpretation since it is remedial in character and evidences an intent in Congress to protect those whose labor and material have contributed to the prosecution of the work. Accordingly, the Heard Act was held to include not only those who furnish labor or material to the prime contractor but those who furnish them to the subcontractor; and this interpretation finds expression in § 270b of the Miller Act which in terms confers the right to bring suit not only up-

on materialmen, laborers and subcontractors who deal directly with the prime contractor, but also upon materialmen, laborers and sub-subcontractors who, lacking express or implied contractual relationship with the prime contractor, have direct contractual relationship with a subcontractor. See MacEvoy v. United States, 322 U.S. 102, 107, 108, 64 S.Ct. 890, 88 L.Ed. 1163.

▮ We conclude that A.R.M. falls within the terms of the statute as one who furnishes labor and material in the prosecution of the work provided for in the contract and that the statute gives rise to a contract implied in law which imposes upon Ross the duty to make compensation.

The judgment in case No. 5416 will be Affirmed.

### No. 5415.

M.B.S. brought suit under the Miller Act against Ross and the Surety and A.R.M.[3] to recover under its contract with Ross and also to recover for additional work outside the scope of the contract; and Ross asserted certain counter-claims in the suit. The claim of M.B.S. is made up of the sum of $395,000 representing the contract price and $45,630.09 for additional work and extras, or a total of $440,630.09. Against this sum payments of $211,035.50 and back charges due Ross of $7,640.91 were conceded, or a total of $218,676.41, making the net claim of M.B.S. $221,953.-68.

Ross conceded that there was due M.B.-S. on the contract price and additions the sum of $420,307.69, but claimed deductions from the contract price for certain items of the work eliminated in the sum of $5,764.46, and in addition claimed a deduction of $117,120.08 for overtime payments, said to have been caused by delinquencies of M.B.S., and back charges of $69,969.13 or a total of $192,853.67. Deducting this sum from $420,307.69 leaves a balance of $227,454.02, against which payments of $211,035.50 were conceded to have been made. This left a balance of $16,418.52 which Ross admitted that it owed to M.B.S. The verdict was in favor of M.B.S. for $214,407.15 which may have been reached by disallowing certain items claimed by M.B.S. or allowing certain items claimed by Ross in addition to those conceded by

---

[3] A.R.M. was made a party to this case because M.B.S. sought to recover from Ross any sums which A.R.M. might recover from M.B.S. for clearing and grubbing additional acreage and for laying the sand-clay sub-base. Liability of Ross to M.B.S. for these items has been discussed in case No. 5414.

M.B.S., or the verdict may represent a combination of both. The case turns on the evidence to support the additional charges of M.B.S. and the overtime and back charges of Ross.

At the trial below the defense to the claim of M.B.S. was presented upon the conclusion of the evidence by a motion for a directed verdict in favor of Ross and also by certain requests for instructions to the jury. The court rejected the motion for directed verdict and gave certain instructions to the jury which fairly submitted the respective contentions of the litigants. The present appeal is based upon the theory that M.B.S. submitted no evidence to sustain the disputed items of its claim and no evidence to challenge the items of the counterclaim of Ross and therefore the verdict and judgment for M.B.S. for a sum only $7,546.53 less than its claim should be reversed.

█ It is manifest, in view of Ross' concession that it was indebted to M.B.S. in the sum of $16,418.52 over and above the counterclaims, that the District Judge committed no error in refusing to direct a verdict in Ross' favor; and it is not clear to us that the judgment should be disturbed merely because the verdict shows that the jury must have found in favor of M.B.S. upon the greater part of its claim and must have rejected all or nearly all of the counterclaim. Ross did not ask for rulings as to specific items of the claim of M.B.S. but contended itself with a general motion for a directed verdict on the entire claim. Moreover, Ross did not ask for a directed verdict in its favor on its counterclaim and such a motion, if made, could not have been granted for it could not be said that the components of the counterclaim were so clearly and positively established that the jury was bound to accept them.

█ The largest item of the counter-claim was in the sum of $117,120.08 which Ross paid for premium overtime, as shown by its payrolls. Ross asserted a claim for this amount on the ground that M.B.S. was dilatory in completing the work assigned to it and in consequence Ross was ordered by the contracting officer of the Government to increase the hours of work in the early part of June from eight hours a day five days a week, to nine hours a day six days in the week, and about July 1 to increase the hours of work to ten hours a day seven days in a week. The objections to this counter-claim, as shown by the evidence, were substantial. M.B.S. denied that it unduly delayed the work which under the sub-contract it was allowed until August 21 to complete; and it was pointed out that the overtime charged included all of the overtime paid by Ross on the job and also on other work at Camp Bradford at a point removed from the site of the Armed Guard School. Furthermore, the evidence tended to show that part of the overtime charged against M.B.S. covered the period subsequent to its completion of its subcontract. In addition it is significant that no previous oral or written warning was given to M.B.S. that it would be held liable for the premium overtime paid by Ross and that the claim for overtime expense was not prepared or asserted until the eve of the trial which took place June 8th to 16th, 1944. When in addition to all of these considerations it is borne in mind that the utmost haste on the part of all the contractors was needed to finish the camp within the period of one hundred days limited in the contract, and that as a matter of fact Ross began overtime work on May 19, 1943,[4] it is obvious that substantial grounds for rejection of this item of the counterclaim were not lacking.

█ There was also substantial foundation in support of the objections to the remainder of the counterclaim consisting of back charges in the aggregate sum of $69,969.13. The largest of these charges, amounting to $27,005.02, was paid to a sewer contractor who was brought to the site by Ross in the latter part of July in order to complete certain sanitary, water and sewer lines covered by the subcontract of M.B.S. The position of Ross was that this step was necessary because M.B.S. was behind with its work. The sewer contractor brought appropriate machinery and equipment and a force of men to do the work but after their arrival it was found upon inspection that the sewer work was nearly complete and M.B.S. was allowed to complete it. The sewer contractor was then instructed to finish the clearing and grubbing work and to do grading in a certain area since Ross contended that M.B.S. was also behind schedule in this part of its work. In fact, some of the clearing and

---

4 It is to be noted, however, that Ross excluded from its claim the first three weeks of overtime.

grubbing work covered by the subcontract had been taken over by Ross in June with the consent of M.B.S. There was evidence on the part of M.B.S. that the sewer contractor used unsuitable, heavy and expensive sewer equipment for the work of clearing and grubbing, that the extent of the work performed by this contractor exceeded that which M.B.S. was under contract to perform, that certain of the equipment of the sewer contractor was stored because there was no use for it and certain other parts of the equipment were used by Ross in other parts of its work. Nevertheless, the expense of the whole work was charged to M.B.S. on a cost plus basis, as well as the cost of transportation of the equipment from the contractor's place of business in Washington and return. It is obvious that the validity and the amount of this item of the countercharge presented a jury question.

With respect to the balance of the counterclaim in the sum of $42,964.11, witnesses for M.B.S. conceded certain items aggregating the sum of $7,640.91 and disputed other items. All of the evidence pro and con was submitted to the jury and it was for them to decide, even in the absence of countervailing evidence in respect to certain items, what weight should be given to the several components of the counterclaim. We find no merit in the present contention of Ross that its entire counterclaim was entitled to full credit and that therefore the judgment should be reversed.

The appellants, however, contend that irrespective of the counterclaim, the evidence in support of the disputed items of the affirmative claim of M.B.S. is so completely lacking that the judgment should be reversed. We do not think that this matter was presented to the trial court in such a manner that it is reviewable here as of right; the defendants asked for a general verdict in their favor in respect to the entire claim of the plaintiff and we are not clothed with the discretion of the trial court to grant a new trial on the ground that the verdict is excessive. Pocohontas Distilling Co. v. United States, 4 Cir., 218 F. 782; R. D. Cole Mfg. Co. v. Mendenhall, 4 Cir., 240 F. 641; United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129. Even if we had this power, we would not be justified in setting aside the verdict because the record contains substantial evidence to support disputed items in the claim of M.B.S. in at least the sum of $5,134.96, by which amount only the verdict exceeded the admitted items of the claim.

This evidence consisted in part of a description of the methods by which the records of M.B.S. were kept and in part of evidence which tended to show extra and additional work done by M.B.S. outside the requirements of the subcontract. Officials who had charge of the subcontract work and who kept records of the charges against Ross in the sum of $10,295.09 for some thirty items of extras, produced the records and other supporting data, and without formally offering them in evidence, submitted them to opposing counsel for inspection and for use in cross examination of the witnesses who testified in respect to the work outside the scope of the contract. A book in which various charges against Ross were entered was put in evidence. Ten of the items listed in this portion of the claim were approved in whole or in part by Ross. There was evidence that others of these additional items related to repairs to sewer lines because of damages caused by trucks of Ross which ran over the lines and broke the pipes. There was also evidence tending to support charges against Ross for extra work in grading areas in close proximity to the buildings in addition to those covered by the subcontract, and evidence tending to show that additional water lines and connections were made to one of the buildings not shown on the plan furnished to M.B.S. For the first of these last-named items M.B.S. made a charge of $5,000 and for the second a charge of $3,696.14. These matters were described to the jury in considerable detail and there was sufficient evidence before the jury as to charges made for similar labor and material to guide the jury in determining what allowance should be made for these items of additional construction, if found to have been installed. We cannot say that this evidence was not sufficient to support a finding in favor of M.B.S. for the sum of $5,134.96 by which the verdict exceeded the admitted value of the work done by M.B.S. under the subcontract.

Ross vigorously contends upon this appeal that none of the disputed items were susceptible of proof because they were not supported by written orders from the contracting officer of the United States or from Ross, as required by the contracts between the parties. This point was

broached by Ross during the presentation of the evidence when certain records were offered by M.B.S. for identification, and the judge expressed the opinion that the contention could not be sustained. Evidence that M.B.S. did work outside the contract was received without objection and the court was not asked to instruct the jury to disregard all items of the claim for which written orders were not given. On this account we might well disregard the contention now but we think that in any event the lack of written orders would not justify a directed verdict in this case as to the items affected.

The subcontract provided that no alterations should be made in the work covered by the contract except upon the written order of Ross stating the amount to be added to or deducted from the contract price. The subcontract further provided that the subcontractor should assume as to the work to be performed all obligations placed upon Ross in the specifications and general conditions of the contract between Ross and the Government. The Government contract authorized the contracting officer to make changes within the scope of the contract by a written order and provided that no change involving more than $500 should be made unless approved in writing by the head of the department and that any claim therefor should be asserted within ten days. The government contract further provided that no charge for any extra work or material would be allowed unless ordered by the contracting officer in a writing in which the price was stated.

Provisions of this kind, which are designed to protect the person at whose expense the work of the contract is performed, have been given effect by the courts under a variety of circumstances;[5] but we do not think that they can be invoked to defeat recovery upon the disputed items in this case. From the beginning of the contract work the parties to the subcontract ignored the provisions as to written orders and proceeded with the work with little or no regard for them. According to the testimony of M.B.S., items listed as extras or additional to the contract were ordered (although not in writing) and accepted by Ross and entered into the construction of the Camp or were used by Ross in the performance of the work which it reserved for itself. On June 9, 1943, before the subcontract was signed by both parties thereto, Ross gave written instructions to M.B.S. in regard to the data to be supplied in making charges for the work which covered both work within and work outside the scope of the contract. M.B.S. was instructed that it should indicate any work performed outside the scope of the contract as soon as possible and that charges for the work should be acknowledged by a representative of Ross and listed on daily reports and that all work performed by Ross for M.B.S. would be backcharged in the same manner. No mention was made of the necessity for previous written orders. Subsequent to this notice a substantial amount of work comprising a number of items was performed by each of the parties to the subcontract for the other, and these items were accepted and paid for or charged one to the other without reference to whether previous written orders had been secured. Indeed no mention was made of the necessity for written orders until November 6, 1943 when the work of the subcontract had been completed and some differences between the parties as to their respective liabilities had arisen. Some of the items in dispute clearly related to matters outside the scope of the subcontract and may more properly be considered the subject matter of additional oral or implied contracts rather than as extras or additions to the subcontract itself. For example, equipment and material was furnished by M.B.S. to Ross which enabled the latter to perform its part of the prime contract; and injuries by Ross to contract work performed by M.B.S. had to be repaired in much the same way as injuries by Ross to roadwork performed by A.R.M.

 We think that under these circumstances, there was substantial ground for the position of M.B.S. that the contract provisions in regard to written orders were waived by Ross by its conduct throughout the period covered by the construction of

5 See Hardwick v. United States, 95 Ct.Cl. 336; James McHugh Sons, Inc. v. United States, 99 Ct.Cl. 414; Feuchtwanger v. Manitowoc Malting Co., 7 Cir., 187 F. 713; Lord Construction Co. v. United States, 3 Cir., 28 F.2d 340; Kelly v. St. Michael's Roman Catholic Church, 148 App.Div. 767, 133 N.Y.S. 328; Stokes Bros. Inc. v. Drefs, 244 App.Div. 524, 279 N.Y.S. 884; Keahon Bros., Inc. v. Blank, 161 Misc. 874, 292 N.Y.S. 257.

the camp. The cases uniformly hold that questions of waiver are questions of fact to be submitted to the jury; and in the face of the testimony which shows that the parties to the subcontract did not regard seriously the terms of the contract in respect to written orders for extra work it would have been error to rule that M.B.S. had completely failed to prove its disputed claims. See Williston, Contracts, Rev.Ed., § 689, n. 4.

We conclude that the judgment in this case should be

Affirmed.